**UNITED STATES of America**

v.

**Albert N. DUKOW, Appellant, et al.**

No. 71–1922.

United States Court of Appeals,
Third Circuit.

Argued April 6, 1972.

Decided July 31, 1972.

See also D.C., 330 F.Supp. 360.

David B. Buerger, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellant.

Kathleen Kelly Curtin, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Before GIBBONS and HUNTER, Circuit Judges, and BECKER, District Judge.

OPINION OF THE COURT

PER CURIAM:

This is a securities fraud case. Defendant Albert N. Dukow ("Dukow") appeals from a judgment of sentence after conviction by a jury on charges of Securities Fraud and Mail Fraud.[1] Dukow is a certified public accountant and business promoter whose troubles stemmed from his activities in connection with the affairs of Champion Industries, Inc. ("Champion"), a Delaware corporation, of which he obtained control in 1962. His co-defendants, charged in the same indictment, were Thomas S. Crow and Saul Brourman, the executive officers of Crow, Brourman and Chatkin ("CBC"), a Pittsburgh over-the-counter brokerage house which dealt in Champion stock, and William J. Abbott, the CBC sales manager. The indictment charged Dukow and the co-defendants with scheming to defraud investors by the sale of Champion stock and using the mails in furtherance of the scheme.[2] The principal thrust of the government's case against Dukow was that, as the controlling party in Champion, he made deliberate misrepresentations and failed to state material facts about the condition of Champion to the CBC management and to its salesmen, who, as the record shows, sold substantial quantities of Champion stock to the investing public.

 The sole question of substance before us is one of sufficiency of the evidence to sustain a conviction.[3] When

---

1. Dukow was indicted in a ten count indictment charging him with four counts of violating 15 U.S.C. § 77q(a) (securities fraud) and four counts of violating 18 U.S.C. § 1341 (mail fraud), as well as conspiracy and aiding and abetting. He was found guilty on the eight fraud counts and not guilty on the aiding and abetting and conspiracy charges.

2. Abbott was acquitted on all counts. Crow and Brourman were found guilty on counts 3 and 4 (securities fraud) and not guilty as to all other counts. Their conviction was affirmed 453 F.2d 1328 (3d Cir. 1972).

3. Dukow has also contended that the trial court committed reversible error when it

sufficiency is at issue on appeal, it is fundamental that we must view the evidence in the light most favorable to the government. United States v. Hamilton, 457 F.2d 95 (3d Cir. 1972); United States v. De Cavalcante, 440 F.2d 1264, 1273 (3d Cir. 1971). It is apparent to us that, when the evidence is viewed in that light, it was sufficient to present a jury question and to support the verdict upon which Dukow was convicted. United States v. Kenny, 462 F.2d 1205 (3d Cir. 1972); United States v. Carlson, 359 F.2d 592, 597 (3d Cir. 1966). The record is voluminous, emanating from a six-week long trial. However, it is unnecessary to review the record in its entirety; the following facts which appear of record amply support the jury's verdict.

When Dukow acquired the controlling stock interest in Champion, it was a paper corporation with no assets of any substance. Shortly thereafter, Dukow, as the controlling party of Champion, initiated a series of financial maneuvers leading to the acquisition by Champion of the Forsberg Manufacturing Company ("Forsberg"), a Connecticut-based manufacturer of hand tools, by means of a so-called bootstrap operation.[4] After the acquisition, Forsberg's cash was used to pay the officers and staff of Champion. In fact, Forsberg was the only source of money for Champion, although, as the result of being acquired by Champion, it had the additional expense of a $150,000 mortgage to the lending firm resulting from the bootstrap operation (see n. 4). There was evidence that Forsberg defaulted on the mortgage notes, and that Dukow was aware of the default. There was also evidence that Champion failed to make payments on the $400,000 debt to Harold Forsberg from whom Champion had purchased the Forsberg stock, and that on October 26, 1962 was declared in default on the agreement of sale.

It is clear from the record that the financial condition of Forsberg was central to the condition of Champion and to the legitimacy of the representations made (see *infra*) by Dukow to the management and salesmen of CBC. Forsberg had been experiencing declining production and sales for several years before its acquisition by Champion; however there was evidence that its condition deteriorated still further after Dukow assumed control. For instance, Miss Catherine Toomey, Secretary-Treasurer of Forsberg, and its bookkeeper for some forty years, testified that, before Dukow assumed control of Forsberg, the company was paying 100% on its accounts payable each month; in August 1962, after Dukow took control, the

---

failed to charge the jury that Dukow's defense was that he was not guilty, and instead stated to the jury that the defendant contended he was not guilty beyond a reasonable doubt. However, a review of Chief Judge Marsh's charge *as a whole* (see United States v. Stirone, 311 F.2d 277 (3d Cir.), cert. den. 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1962)), demonstrates that Dukow's defense was accurately presented to the jury and that there was no inconsistency in his charge.

4. It was agreed that Champion would purchase Forsberg for the sum of $500,000, of which $100,000 was to be paid as a down payment, and the balance of $400,000 to be in the form of long-term promissory notes to Harold Forsberg from whom the stock was being acquired. The Forsberg stock was to be held in escrow to secure payment. The sales and escrow agreements between the parties had provided that the real and personal property of Forsberg was to be mortgaged only for the purpose of providing working capital (*i. e.*, Harold Forsberg did not want his former assets mortgaged in order to pay the debt). However, a broker, acting on Dukow's behalf, arranged a mortgage of $150,000 on the assets of Forsberg to secure a loan which would supply the down payment of $100,000. Harold Forsberg refused to accept the check of the lending firm to cover the down payment. Dukow's broker, Michael Brodsky ("Brodsky"), who was an unindicted co-conspirator and an important government witness, thereupon arranged for a $100,000 weekend turn-around loan so that a Champion check for $100,000 could be issued to consummate the acquisition.

company paid 75%; in November 60%; and by December, Forsberg was paying only 30% or 40%. According to Miss Toomey, Dukow was aware of this difficulty with creditors. Miss Toomey also testified that during November and December 1962, between sixty and eighty creditors sent certified dunning letters and the company received calls from attorneys demanding payment of outstanding bills. Every day she would give Dukow a list of those who had called, but he would reply, "Well, don't worry about it, I am getting money in." Some suppliers ceased supplying goods to the company. Late in November the payroll checks to the employees "bounced" and a Connecticut state official threatened padlock proceedings unless the checks were made good. Miss Toomey testified that in December Forsberg owed over $5200 to the Internal Revenue Service, and that in January the sum increased to over $12,000; Dukow was aware, according to Miss Toomey, that these sums were unpaid.

On the subject of Forsberg's sales, there was evidence that 1962 sales were below those of 1961, during which Forsberg had lost money. Dukow testified that production and sales actually increased during the period from July to December 1962, while he was in control of Forsberg.[5] However, the record also establishes that this increase followed a similar increase for the same period in 1961 but was below the increase for that period of 1961. And, there was evidence that, despite Forsberg's financial difficulties, salaries for officers rose substantially during the period of the Dukow management and that Forsberg rented two Lincoln Continentals, one of which was for Dukow's use. Moreover, despite the funneling of funds to it from Forsberg, Champion was constantly in dire need of cash.

Dukow had contemplated efforts to raise working capital to put Champion on a sounder financial base so as to make possible the acquisition of other subsidiaries, and it was in this connection that he approached CBC with respect to its sale over the counter of Champion stock. Dukow met with Abbott and Crow in October 1962. A meeting was then arranged for Dukow to speak to the CBC salesman in Pittsburgh on January 24, 1963 about the prospects of Champion. The record supports the conclusion that on this date Dukow was aware of all of the financial problems of Champion and its principal prop of operations, Forsberg, which we have recited. Yet, according to the government's testimony, Dukow represented to the CBC salesmen at the January 24th meeting that: (1) Forsberg was "in the black" and "making money"; (2) the book value of Champion was $1.-78 a share; (3) Champion would show between $.22 and $.25 a share earnings in the coming (1963) year, with Forsberg doing up to $60–70 thousand a month in sales; and (4) Champion had a good line of credit. Based upon the facts adduced by the government including those we have set forth above, there was ample basis for the jury to infer that these representations were false.

The government introduced testimony that at the January 24, 1963 meeting, Dukow informed the CBC salesmen that Champion had already acquired Sterling Hardware, a wholesale firm in the midwest which would serve as an outlet for Forsberg products. However, the record contains evidence which would support the conclusion that this representation was false; the Dukow's contract to acquire Sterling had expired by January 24, 1963; that there was no second contract; and that Dukow was still seeking funds, as of that date, and as late as February 16, 1962, with which to acquire Sterling.

In addition to that misrepresentation about the Sterling Hardware acquisition, the record contains a transcript of messages sent from the CBC office in Pitts-

5. The record establishes that during the period of Champion's control of Forsberg, the volume of sales was down $27,000 from the identical period of the previous year.

burgh to the CBC office in Florida which represented that Champion had already acquired Circle Air Products of New York, A&K Electric Corp. and Ultra-Dynamics Corp. Dukow conceded that no such acquisitions had been made but argues that there is no evidence connecting him with the (mis) representation contained in this transcript. However, a government witness, Brewster, formerly a bank vice president and loan officer, testified that, on Februrary 16, 1963, Dukow had represented to him in the presence of Crow that Champion had acquired, *inter alia*, A&K Electric and Circle Air Products.

At the January 24th meeting, Dukow presented the CBC salesmen with a binder containing a collection of brochures and reports that he had personally prepared for distribution from time to time to the shareholders of Champion. These brochures were to be used by the salesmen to solicit sales for Champion stock. In addition to the evidence from which the jury could conclude that oral misrepresentations were made, the jury could also have concluded that the brochure contained false and misleading statements. The brochure contained a latter from Dukow to the shareholders of Champion dated October 29, 1962 in which Dukow made certain representations about the financial condition of Champion. The letter indicates that the net worth of Forsberg was $538,000 "giving effect to the refinancing and sale and leaseback of the real estate of the company" (Gov't ex. 84). However, there is evidence that there never was a sale and leaseback, although Brodsky testified that he was negotiating for one in the fall of 1962 and in February of

1963. Dukow claims that the August 1962 balance sheet reflecting the sale and leaseback was only a pro forma sheet, yet there is evidence that Dukow never informed the salesmen that this was the case. The October 29 letter also suggests that audited financial figures would soon be forthcoming. In fact, neither Mr. Forney, an accountant hired by Dukow to prepare a balance sheet for Champion, nor the national auditing firm of Arthur Andersen and Co. hired later, was ever able to supply an audited balance sheet since there was neither a general ledger nor any other books of original entry. When Arthur Andersen finally submitted figures to Champion in April, none of the figures were verified. The October 29 letter also stated that:

> "Comparative sales figures have not been computed, but we can anticipate $800,000 sales volume for Forsberg Manufacturing Company and an estimated net profit of $50,000."

The record, on the other hand, shows that comparative sales figures had been computed, and the projection flies in the face of evidence that, on a comparative basis, sales were declining.

Supplementing the evidence of misrepresentations, the government introduced evidence that Dukow *failed* to disclose to the CBC salesmen many material facts of which he had knowledge. Several CBC salesmen testified that Dukow never told them that Champion was in default on the Forsberg notes. Yet, the record also shows that Harold Forsberg was threatening to repossess the plant,[5a] and that, as of February 5, 1963, Dukow was trying to borrow money to prevent a repossession.[6] Indeed,

---

**5a.** The government contends that Dukow was in technical default from the very beginning since Dukow mortgaged the assets of Forsberg to raise the down payment money in violation of the escrow agreement. Dukow testified that the mortgage was dated July 24, 1962 before the sale on July 27, and that the escrow agreement had prospective effect only. Furthermore, Dukow asserted that Harold Forsberg acquiesced in the mortgage.

In any event, Dukow never intimated on January 24 that there was any problem with the Forsberg plant.

**6.** Dukow and his broker, Brodsky, even contacted Crow to ask him to arrange a loan for $10,000. They told him that the money was needed to make a monthly mortgage payment when in fact the money was needed as "good faith" money to keep Harold Forsberg from repos-

Dukow never informed CBC of these matters until after Harold Forsberg took possession on February 20, 1963. Brourman testified that Dukow told him in March that he was making new financing arrangements to get Forsberg back. CBC stopped selling Champion stock for a short time after learning of the repossession but commenced selling it again on March 15, 1963 after reassurances from Dukow that everything would be taken care of.[7] In addition to the foregoing, Dukow also failed to inform the CBC salesmen about Forsberg's tax difficulties or about the many matters testified to by Miss Toomey which we have related above.

By the foregoing recitation of facts taken in the light most favorable to the government, we do not mean to suggest that the testimony of each of the many government witnesses was absolutely consistent with the testimony of every other. Although there is evidence to support each of the facts we have recited, the recollections of several of the former CBC salesmen who testified as to the events of the January 24, 1963 meeting differed in some degree. Neither do we mean to suggest that Dukow did not present the facts in a much different light. Indeed, Dukow presented an "answer" for virtually every allegation made by the government (although his "answers" did not always stand up to close scrutiny). Dukow has asserted that he did not misrepresent to the CBC salesmen and that, if they misrepresented to their customers in order to induce them to purchase Champion stock, the misrepresentations are not attributable to him. He also avowed ignorance of certain financial details which it is charged he misrepresented. However, this is the stuff of which jury issues are made. The conflicting contentions were submitted to the jury, and the jury rendered its verdict. What Dukow has in essence said on this appeal is that, viewing the facts in the light most favorable to *him,* there must be an acquittal. But, of course, that is not the test.

In his opinion denying motions for new trial and arrest of judgment in the court below, Chief Judge Marsh summarized the evidence as follows:

"Dukow was the principal link between Champion and CBC . . . he addressed CBC's salesmen in Pittsburgh on January 24, 1963, upon the merits and prospects of Champion; and he presented to them a brochure. Undoubtedly, he was then aware of Champion's poor financial status, nebulous prospects for acquiring subsidiaries, the problems at the Forsberg plant, including the breach of warranties, and the lurking danger of its being repossessed for non-payment, none of which did he reveal to the CBC salesmen."

As we have indicated in our partial factual review, there is sufficient evidence, both direct and circumstantial, from which reasonable inferences could be drawn which supports these conclusions as well as the conclusion that Dukow engaged in a scheme to defraud investors by the sale of Champion stock and used the mails in furtherance thereof.[8] We cannot say that the evidence, looked at in the required light, does not support the jury verdict.

The judgment of the court below will be affirmed.

---

sessing. Dukow was claiming certain breaches of warranty and Harold Forsberg had in fact agreed to a reduction in the purchase price but only on the condition that Dukow immediately pay $10,000 "good faith" money and the balance within ninety days thereafter.

7. Forsberg was never reacquired and on March 19, 1963, Harold Forsberg filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. There is evidence, howeevr, which indicates that CBC continued to sell Champion stock even as late as June 11, 1963, long after Champion had lost Forsberg, even though, without Forsberg, Champion had no viable assets.

8. We refer to a "partial" factual review. There are other facts in the voluminous record which also support the government's position.