**UNITED STATES of America**

v.

**Joseph Anthony IEZZI, Sr., Albert David Milani, D.C., James D. Potter, M.D., Jack H. Pincus, M.D., Kenneth Joseph Ferris, Elias Ivan Yurick, D.O., Paul Nicholas Scolieri, Louis D. Adams, Robert Louis Plusquellec, Bernard L. Shapiro, D.D.S., Louis Anthony DeSantis, Anthony Crivelli, Sr., Louis Charles Boscia.**

**Crim. No. 76–124.**

United States District Court,
W. D. Pennsylvania.

Dec. 22, 1976.

David M. Curry, First Asst. U.S. Atty., Pittsburgh, Pa., for plaintiff.

Stanley M. Stein, Pittsburgh, Pa., for James D. Potter, M.D.

John L. Doherty, Pittsburgh, Pa., for Paul Nicholas Scolieri.

Irving M. Green, New Kensington, Pa., for Louis D. Adams.

William A. Goyette, Pittsburgh, Pa., for Robert Louis Plusquellec.

Leonard A. Costa, Jr., Pittsburgh, Pa., for Louis Anthony DeSantis.

Richard H. Martin, Pittsburgh, Pa., for Anthony Crivelli, Sr.

John J. Dean, Pittsburgh, Pa., for Louis Charles Boscia.

Leonard L. Martino, Pittsburgh, Pa., for Joseph Anthony Iezzi, Sr.

## OPINION

MARSH, District Judge.

The defendants, Joseph A. Iezzi, Albert D. Milani, D.C., James D. Potter, M.D., Elias Yurick, D.O., Paul N. Scolieri, Louis D. Adams, Robert L. Plusquellec, Bernard L. Shapiro, D.D.S., Louis A. DeSantis, Anthony Crivelli, Sr., and Louis C. Boscia, were tried on a charge of conspiracy to defraud an insurance company by use of the mails, 18 U.S.C. § 371, and eighteen substantive counts of mail fraud, 18 U.S.C. § 1341. Five substantive counts were dismissed by the court. Elias Yurick was acquitted. The remaining defendants were all convicted of conspiracy and each was found guilty of mail fraud, ranging from the conviction of Crivelli on one count to the conviction of Boscia on all thirteen counts.

Seven defendants, Dr. Potter, Scolieri, Adams, Plusquellec, DeSantis, Crivelli and Boscia,[1] filed motions for arrest of judgment, judgment of acquittal, or for a new trial; one defendant, Iezzi, filed only a motion for a new trial. All filed briefs except Boscia.

■ It does not appear in the motions or briefs that the indictment does not charge an offense, or that the court was without jurisdiction, hence the motion in arrest of judgment will be denied.

Taking the view of the evidence most favorable to the prosecution, as required, we think the verdicts of guilty against ten of the defendants who stood trial were supported by evidence beyond a reasonable doubt. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Dukow,* 465 F.2d 688, 689, 692 (3rd Cir. 1972). We are not convinced that there were errors requiring that a new trial be granted to any defendant.

Briefly, the prosecution proved by overwhelming evidence that defendants Boscia, Scolieri, DeSantis, Plusquellec, along with Kenneth Ferris, who pleaded guilty, and Thomas Cherubin, an unindicted conspirator who was granted immunity, conspired to

---

1. Dr. Milani and Dr. Shapiro did not file motions.

stage a fake motor vehicle accident with the intent to defraud the St. Paul Mercury Insurance Company, one of the St. Paul Insurance Companies (St. Paul).

. Boscia had influenced Cherubin to take out an automobile insurance policy with St. Paul. Boscia paid the premium on the policy and gave Cherubin $1,000 prior to the staged accident. After the staged accident Boscia gave Cherubin another $1,000 and $50 for airplane tickets to return to Erie.

In the early morning of November 25, 1973, after previous abortive attempts, Boscia intentionally drove Cherubin's Chevrolet Blazer into the rear of Scolieri's car while the latter was stopped at an intersection in West Homestead, Allegheny County, Pennsylvania. Before the collision, Scolieri and his passengers, Ferris and Plusquellec, had vacated the Scolieri car and Cherubin and DeSantis had vacated the Cherubin vehicle. Afterwards, Cherubin went to a nearby police station to report the accident. Joseph Iezzi pretended he had been a passenger in Cherubin's car and pretended he had been injured in the collision.

By the time the police arrived, DeSantis had reentered the Cherubin vehicle and the others were standing around. DeSantis, Ferris, Plusquellec and Scolieri pretended they had been injured in the fake collision and the police took them to the Homestead Hospital where all except DeSantis left the same day. DeSantis, who had suffered a prior heart attack, stayed in the hospital for treatment of his heart until December 6, 1973. Boscia and Cherubin left the scene, taking the Cherubin vehicle to Iezzi's Body Shop where it was to be repaired. From there they went in Boscia's car to Cherubin's apartment where Boscia gave Cherubin instructions with respect to reporting the accident to the insurance company. Cherubin then took a plane for Erie where he was then working.

With extensive cooperation of Louis Adams, the claims manager for St. Paul who handled the claims against Cherubin's poli-

cy, all the foregoing, except Cherubin and Boscia, received money from St. Paul for alleged injuries.

Thereafter, with the professional cooperation of Dr. Albert Milani, Dr. James Potter, Dr. Bernard Shapiro, Dr. Jack Pincus, who was not tried, and others who were not indicted, St. Paul paid the participants and their respective doctors and car repairmen in excess of $80,000 for hospitalization, alleged bodily injuries, alleged lost wages, car repairs, et cetera.

Specifically, Dr. Milani joined the conspiracy and provided false medical bills and false medical reports for DeSantis and Iezzi. DeSantis received four drafts totalling $9,100 for which he signed a release. Iezzi received three drafts totalling $4,885 of which one draft of $305 was issued to Iezzi and Dr. Milani and one draft of $105 was issued to Iezzi as reimbursement for Dr. Yurick's bill.

Dr. Potter joined the conspiracy in Henderson, Nevada, and provided Ferris with a false medical bill on a Henderson Clinic form and a false medical report on an insurance form. Ferris, like the other participants, had no injuries and was never examined by Dr. Potter. Nor was Ferris ever treated or even seen by Dr. Charles Ashman, a dentist who had his office near the Henderson Clinic. A false dental bill for Ferris totalling $2,360 was submitted to the insurance company on Dr. Ashman's letterhead and billhead accompanied by a medical report form on which someone other than the doctor has signed Dr. Ashman's name. The evidence shows that Boscia paid $200 to Gail Richmond, an employee of Dr. Ashman, to obtain a blank letterhead and billhead of Dr. Ashman. She also told Boscia some dental nomenclature to be used to complete the false bill and medical report.[2]

A single St. Paul draft for $8,975 was issued to Ferris. Ferris received the draft from Boscia on January 6, 1974, at the Pittsburgh airport where Ferris endorsed

---

2. It is noted that both the medical report signed by Dr. Potter and the medical report bearing Dr. Ashman's name are on a St. Paul company form identified as 11903 MRF. See testimony of Nancy Greenawalt, St. Paul's current claims manager.

the draft and signed a release and returned both documents to Boscia. Ferris testified that the agreement had been that he and Boscia would split the money evenly, but that he let Boscia keep the entire amount to cover a debt of more than $4,000 which Ferris owed Boscia.

Dr. Shapiro joined the conspiracy and provided Scolieri with a false dental bill in the sum of $3,380. Dr. Pincus provided him with a false medical bill of $485 and a false medical report. Scolieri received three drafts from St. Paul for bodily injuries and fictitious wage loss in the sum of $25,000. In addition, to cover the repairs to his car, he received a draft for $2,025 which he deposited in the bank account of Circus-Circus, the Las Vegas hotel for which he worked as a junket operator. He also received $641.77 to pay a false car rental agreement with Crivelli Chevrolet.

Dr. Pincus provided Plusquellec with a false medical report and a bill for $95 which was paid by St. Paul. Monsour Hospital was paid by a draft for $1,895 and Braddock Hospital was paid by a draft for $74.75, for medical treatment and hospitalization rendered Plusquellec for an injury to his knee which occurred prior to November 25th, 1973. In addition, Plusquellec received three drafts for bodily injuries and fictitious wage loss in the total sum of $25,750, which drafts were endorsed in his name and cashed by Casey Babuscio who gave the money to Boscia. How much he gave Plusquellec is not known.

St. Paul paid for the repair of Cherubin's vehicle by a draft made out to Cherubin, the finance company, and Iezzi Auto Body in the sum of $521.91.

## DENIAL OF MOTION TO SEVER

The defendants contend that they are entitled to a new trial because the court abused its discretion in failing to grant their individual and joint motions for severance. Rule 14, Fed.R.Crim.P. They rely on *United States v. Sica,* 560 F.2d 149 (3rd Cir., decided October 20, 1976).* We think their reliance is misplaced.

To grant a motion for severance a defendant must show something more than the fact that a separate trial might offer him a better chance of acquittal. 8 Moore, Federal Practice ¶ 14.04[1] at 14–14.2—14–15 (2nd ed. 1976). The test for prejudice is:

". . . whether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted."

*Tillman v. United States,* 406 F.2d 930, 935 (5th Cir. 1969). See also *Peterson v. United States,* 344 F.2d 419, 422 (5th Cir. 1965); *United States v. Kahn,* 381 F.2d 824, 839 (7th Cir. 1967); *United States v. Stitt,* 380 F.Supp. 1172, 1176 (W.D.Pa.1974), *aff'd* 510 F.2d 971 (3rd Cir. 1975).

The defendants allege prejudice by their inability to call co-defendants to testify on their behalf. The defendants Potter, Crivelli, Shapiro and Adams testified in defense. The defendant Jack Pincus, M. D., was severed because of the inability of his retained counsel to attend the trial due to serious family illness. Although Dr. Pincus was not on trial, no defendant subpoenaed him to testify.

An intention of a movant to have a co-defendant testify has never been considered as a ground for severance. None of the movants have shown nor asserted that any non-testifying defendant's version of the facts would have any exculpatory effect; or that any non-testifying defendant would more likely testify if a movant were tried separately. The movants' bare assertions that the joint trial deprived them of the testimony of their co-defendants, with-

* Judgment vacated; petition for rehearing granted, December 16, 1976.

out a showing of the likelihood of their testimony being given in separate trials, and without any evidence that their testimony would tend to exculpate the movants, is not sufficient to show prejudice. *Tillman v. United States, supra,* 406 F.2d at 936; *Brown v. United States,* 126 U.S.App.D.C. 134, 140–41, 375 F.2d 310, 316–17 (1967).

▮▮▮▮ The unsupported possibility that a co-defendant would testify in a severed case does not render a refusal to sever erroneous. *United States v. Kahn, supra,* 381 F.2d at 841. Thus, to justify severance for reason of testimony, a defendant must make a showing that the testimony of a co-defendant would be exculpatory in effect and that the co-defendant would in fact testify. *United States v. Somers,* 496 F.2d 723, 731 (3rd Cir. 1974); *Tillman v. United States, supra,* 406 F.2d at 936.

Since Boscia, DeSantis and Yurick had previously been convicted in this court at Criminal 75–04 of similar charges arising from the staging of a fake motor vehicle accident it would be highly unlikely that they would have testified if severance had been granted. Had they testified, it is very likely that their testimony would have been subject to substantial, damaging impeachment. *United States v. Finkelstein,* 526 F.2d 517, 523–525 (2nd Cir. 1975).

None of the defendants made a showing that any co-defendant would testify if the trials had been severed. See *United States v. Stitt, supra,* 380 F.Supp. at 1176, involving another fake motor vehicle accident staged in this district.

We think the motions to sever were properly denied.

## SUFFICIENCY OF THE EVIDENCE

Most of the defendants, relying on *United States v. Klein,* 515 F.2d 751 (3rd Cir. 1975), argue that the evidence was insufficient to sustain their convictions.

Iezzi argues that the evidence fails to establish that he had the required knowledge of the conspiracy's illicit purpose. We disagree. The evidence was convincing that Iezzi was not present at the scene of the staged accident. Boscia, who was present, pretended he was Iezzi. Later, Iezzi gave a false statement to Inspector Trainor that he was injured in the accident as a passenger in Cherubin's vehicle. He gave a false account of the treatment he received from Drs. Yurick and Milani. It was shown that Boscia assisted Iezzi in settling his false claims against the insurance company, and disposed of the proceeds of the settlement. Iezzi's signature was identified on two of the drafts issued by the defendant Adams on behalf of St. Paul in connection with the Iezzi settlement.

▮▮ The evidence that Iezzi filed and settled claims with St. Paul for injuries and medical expenses allegedly sustained in an accident in which he was actually not present provided facts and circumstances which clearly disclosed Iezzi's knowledge of the illicit purpose of the conspiracy and scheme to defraud the insurance company.

Adams argues that the evidence was insufficient to establish his required knowledge of the conspiracy's illicit purpose. It is sufficient to note that the evidence against Adams ranged from the testimony of Cherubin that he understood from Boscia that he had nothing to worry about, to the testimony of Ferris that his only meeting with Adams was at the Carlton House lounge in the presence of Boscia and that the accident was not even discussed at that time.

▮▮ It was proved that Adams failed to follow up indications that Plusquellec and DeSantis had been involved in previous accidents; that he failed to secure background information on Scolieri even though advised to do so by his supervisor; that he accepted Scolieri's false dental charges without proper investigation especially in the absence of any suggestion of injury to Scolieri's mouth or teeth; and that he failed to procure copies of Homestead Hospital records. Also to be considered are: Adams' inability to explain how he was able to reach Cherubin by phone; his false accounts of the Iezzi and Ferris settlements; and, his insistence that Boscia had

nothing to do with the settlements of the false claims in the light of overwhelming evidence that Boscia engineered the conspiracy and was seen with Adams during the time Adams was settling Scolieri's claim. Adams authorized most of the drafts paid by St. Paul. These circumstances and many others not mentioned show clearly Adams' knowledge of the illicit purpose of the conspiracy and the scheme to defraud the insurance company for which he worked.

■ Plusquellec argues that the evidence was insufficient to establish that he had the requisite knowledge of the illegal purpose of the conspiracy. It was proved that Plusquellec participated in the conspiracy; that he was present at the scene of the fake accident; that he did not sustain any injuries; that Eugenia Butera signed a false employment letter for him following the fake accident; that her signature on the letter submitted to St. Paul was a forgery; that he misrepresented his employment at the Pagoda Beauty Shop; that he filed a false claim and was issued three drafts by St. Paul for a total of $25,750; that at least two of the drafts were endorsed by Plusquellec, and all three were cashed by Casey Babuscio who gave the money to Boscia. This evidence was ample proof of his knowledge of the illicit purpose of the conspiracy and scheme to defraud.

Boscia, DeSantis and Scolieri did not brief the issue of sufficiency of the evidence. Boscia managed the conspiracy from the beginning to the end and undoubtedly reaped a harvest. Boscia and DeSantis were in Cherubin's vehicle at the scene on November 25th. DeSantis got out of the vehicle while Boscia drove it into the rear of the empty Scolieri car. DeSantis got back into the vehicle and was found therein by the police, who knew him as a prior coronary victim and immediately took him to Homestead Hospital. His false claims were paid by St. Paul.

■ It is eminently clear that Boscia and DeSantis, as well as their companions, had knowledge that morning of the illicit purpose of the conspiracy to defraud Cherubin's insurance company which purpose was fully accomplished.

Scolieri had driven Plusquellec and Ferris to the scene of the accident in his Chevrolet Caprice. They vacated the car and Scolieri permitted Boscia to run Cherubin's Blazer into the rear of the Caprice. Scolieri's false claims were paid by St. Paul. He, like the other participants, was a member of the conspiracy and had knowledge of its illicit purpose.

■ Likewise, it was proved beyond a reasonable doubt by persuasive circumstantial evidence that Dr. Milani, Dr. Potter, Dr. Shapiro and Mr. Crivelli had knowledge of the illicit agreement to defraud an insurance company and voluntarily joined the original conspirators in perpetrating the fraud. The jury was convinced of their participation and that each could reasonably foresee that the mails would be used in perpetration of the fraud. As to the specific substantive counts of which each conspirator was convicted, the jury found that the mailings therein specified were in furtherance of an essential step in the execution of the fraudulent scheme. See *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1952).

Dr. Potter's complicity has heretofore been stated. In addition, his preparation of a false bill for medical services he did not perform for Ferris and of a false medical report which reflected a history of the accident of November 25th 1975; a diagnosis of the injuries sustained (although Ferris did not sustain any injuries); a report of x-rays allegedly taken at Henderson Clinic; and a prescription for treatment allegedly made necessary by the accident, were critical to his guilty knowledge of an illicit agreement to defraud an insurance company. Insurance cases represented a large part of the business of Henderson Clinic and Dr. Potter's practice included treatment of many insurance claimants. Obviously the jury did not believe Dr. Potter's exculpatory explanations and was entitled to consider the false explanation as circumstantial evidence of guilt. This is especially highlighted

when the alleged "free" examination of Ferris was at the request of Dr. Potter's friend, Boscia, who had entertained Dr. and Mrs. Potter by treating them to dinners and shows in Las Vegas.

■ It is clear that the jury was justified in finding that Dr. Potter possessed guilty knowledge of the original conspirators' agreement to defraud the insurance company and joined with co-conspirators Ferris and Boscia as a member of the conspiracy.

Scolieri had his car repaired at Crivelli Chevrolet where employees had been informed that there was insurance coverage to pay for the repairs. The defendant Anthony Crivelli was a part owner of Crivelli Chevrolet and in charge of car rentals. He testified he was also service manager and supervised 40 employees, had a half interest in a beer distributorship, and promoted, organized and ran vacation trips to Las Vegas. From this the jury could have found Crivelli was a knowledgeable businessman. The evidence established that Crivelli was well acquainted with Scolieri, and that Crivelli knew Boscia, and that he had been on several junkets to Circus-Circus Hotel in Las Vegas. Crivelli testified that he had lost money gambling at Circus-Circus but that he always paid up.

Crivelli rented a car to Scolieri while Scolieri's Caprice was being repaired. The rental agreement, which disclosed rent amounting to $722.57, was marked "Paid in Full" by Crivelli who gave it to Scolieri. Scolieri later submitted it to St. Paul and received a draft from St. Paul for $641.77, the cost of gasoline having been deducted. Crivelli marked the dealership's copy of the rental agreement "Void" and filed it. He made out a new rental agreement and reduced the charge to $254.40 because Scolieri was a good customer who requested and received a more favorable rate. According to Crivelli, good customers got a 50% reduction on rentals while their cars were being repaired.

The evidence discloses that Scolieri and his company, Las Vegas Travel Club, were not good customers. They owed Crivelli Chevrolet $2,000 at the time and eventually owed $5,000 which was charged off as uncollectible. Moreover, the full-size car Scolieri had rented did not qualify for the reduced rate. Crivelli admitted that the reduction for Scolieri was more than 50% since the second agreement did not provide for a mileage charge. He was not able to provide any evidence of receipt of payment for the second agreement beyond a pencil entry on an account recap sheet in the same amount as the charge but recorded at some unknown time far after the transaction.

Although he was head of the service department, Crivelli was unable to establish that any payment for repairs to Scolieri's car amounting to over $2,000 was ever received. Catherine Booker, a bookkeeper for Crivelli Chevrolet testified she had never seen the repair order of $2,136.27, had never billed Scolieri or Las Vegas Travel Club for it and had never received payment. She also testified that under normal office policy the customer's copy of rental agreement No. 265 (for $722.57) which Scolieri had submitted to St. Paul marked "Paid in Full" normally would have been retained in the company files with other copies of the agreement if the agreement had been properly voided.

Evidence was also introduced that a $2,025 draft of St. Paul, issued by the defendant Adams to Scolieri for partial payment of the repair bill of $2,136.27, was deposited to a Circus-Circus account which was used for the deposit of funds collected on gambling debts of Scolieri's junketeers, of which Crivelli was one. Significant, too, were the facts that: (1) Scolieri was not permitted to gamble at Circus-Circus because of his role as junket operator and, (2) Scolieri could not draw upon the account into which the $2,025 draft was deposited. These circumstances support an inference that the deposit of the draft was for the benefit of Crivelli.

While under cross-examination Crivelli was hostile, reluctant, very evasive and contradictory. Thus, the jury had several bases for rejecting Crivelli's protestation of innocence with respect to knowledge of the

illicit purpose of the conspiracy. The jury was entitled to disbelieve Crivelli and treat his exculpatory explanations as circumstantial evidence of guilt. *United States v. Cisneros,* 448 F.2d 298, 305–306 (9th Cir. 1971); *United States v. Chaney,* 446 F.2d 571, 576 (3rd Cir. 1971); *Verdugo v. United States,* 402 F.2d 599, 604 (9th Cir. 1968). Having been in the car repair and car rental business for many years, it can be inferred that Crivelli knew that Scolieri was going to present the voided car rental bill of $722.57 marked "Paid in Full" to his insurance company.

 Thus we think the direct evidence relating to Crivelli's car rental business, combined with the circumstantial evidence, is sufficient to show that Crivelli had knowledge of the illicit agreement and scheme to defraud the insurance company; the evidence shows that he had a motive and an opportunity to join the scheme and that he possessed the intent to participate in it by giving to Scolieri the rental agreement (No. 265) marked "Paid in Full" when the company's copy of the agreement was marked "Void." The jury was justified in finding him a co-conspirator.

## THE PRIVATE COMMUNICATION WITH A JUROR WHICH DID NOT RELATE TO A MATTER PENDING BEFORE THE JURY

On Thursday, October 14, 1976, after 7 weeks of trial, Juror No. 12, Patricia Boyle did not appear in court. She advised the Clerk by telephone that she was upset over the tragic death of her boyfriend.[3] She was excused by the court and an alternate was substituted.

That evening at the insistence of the defendant Louis Charles Boscia, an appointed investigator, Fred Koerner, telephoned Miss Boyle. He told her he represented a member of the defense team, and requested the name of the party who was deceased.[4] Miss Boyle declined to give him any information stating she had made her explanation to the court.[5] Later that evening she telephoned the Chief Deputy Clerk, Mr. Conley, and informed him of that call.[6] She was not upset or scared by the call.[7]

On Friday afternoon, after the summations of counsel, Mr. Dean, the attorney for Boscia, suggested in the presence of the jury that all defense counsel had agreed that the jury could go home on Monday at 5:00 o'clock, if they had not arrived at verdicts. Mr. Curry, the prosecutor did not consent. On Monday Mr. Curry consented to the jury returning to their homes. The court, however, having been informed by the clerk of the telephone call to excused juror No. 12 from a representative of the defense, decided to sequester the jury overnight. The court informed counsel, in the absence of the jury, that a factor in its decision to sequester regardless of counsels' consent was the telephone call to the excused juror by someone claiming to represent the defendants.

Thereupon Mr. Livingston, counsel for Dr. Milani, informed the court that a private investigator had called him on Friday morning, October 15th, "to tell me he had made such an overture . . . concerning some proposition with reference to No. 12 juror. There has been representations made in my presence concerning overtures made to No. 12 juror, at least by the physical appearance of certain witnesses in this courtroom." He thought "it was a matter of proper inquiry for the defendants to inquire of No. 12 juror if such overtures were made, and if they were, whether she conveyed those overtures to any other member of this jury because I think her conveying of such overtures to another member of the jury could affect this entire jury."[8]

---

3. Transcript of October 18, 1976 at page 38.

4. *Id.* pp. 34–35. This inquiry did not relate to any matter pending before the jury.

5. *Id.* pp. 11–12, 35.

6. *Id.* pp. 13, 15.

7. *Id.* pp. 13, 19, 35–36.

8. *Id.* pp. 5–6.

Apparently other defense counsel had been told on Friday, October 15th, of the investigator's call to excused juror No. 12, but none of them expressed concern about jury contamination to the court until Monday, after the charge and after the alternates had been excused.[9]

The court, with the express approval of the prosecutor and Mr. Livingston and with sub silentio approval of the other defense counsel who were present, advised that juror No. 12 would be brought in and interrogated about the telephone call from the investigator.[10]

No request was made at any time by any defense counsel to be present at the interview; no request was made for a hearing in open court.[11] Cf. United States v. Neff, 343 F.Supp. 978, 985 (E.D.Pa.1972), aff'd 475 F.2d 861, 863–864 (3rd Cir. 1973).

On Tuesday, October 19th, the court, in camera,[12] interviewed Patricia Boyle, the excused juror No. 12, and found that she had told her friend of seven weeks, Pamela Perry, juror No. 11, about the call from the investigator.[13] Both Miss Boyle and Miss Perry are young women and apparently became good friends during the trial.[14] When Miss Perry heard that Miss Boyle's boyfriend had died she communicated on the telephone with Miss Boyle on Friday, October 15th and Sunday, October 17th.[15]

On Tuesday, October 19th, the court, in camera interviewed Pamela Perry, juror No. 11,[16] and found that she had told jurors Charles Latcheran and John Deiger about a telephone call she had made to Miss Boyle.

On Wednesday, October 27th the court, in camera, interviewed Charles Latcheran [17] and John Deiger [18] and found from Mr. Deiger that he and juror Mary Fagan were told about the telephone call by Miss Perry.

On Thursday, October 28th, the court, in camera, interviewed Mary Fagan.[19]

Also, on Wednesday, October 27th, the court, in camera, interviewed Fred Koerner the investigator appointed for the defendants Louis Charles Boscia and Robert Plusquellec.[20]

The interviews were transcribed and sent to counsel for all the convicted defendants.

From the interviews the court makes the following findings of fact:

1. The telephone communication from the investigator, Fred Koerner, to Patricia Boyle, excused juror No. 12, did not relate to a matter pending before the jury. The investigator merely asked the name of her deceased boyfriend which she declined to give, and she advised the Chief Deputy Clerk of the call.[21]

9. Id. pp. 7–8. It should be pointed out that orderly disposition of a criminal case might be seriously disrupted if defense counsel is permitted to wait until after the alternates are discharged and the jury has retired to deliberate to raise questions of possible prejudice arising from facts such as occurred here. It has been properly said that: "A disqualification which by reasonable diligence could have been discovered before verdict, may not afterwards be made the subject of an attack upon the verdict." Brown v. United States, 356 F.2d 230, 233 (10th Cir. 1966).

10. Id. p. 8.

11. Id. p. 8. After more than 7 weeks of trial it is understandable that counsel for the 10 defendants were not particularly desirous of further in-court proceedings.

12. This interview and all subsequent interviews were conducted in chambers with a court reporter present.

13. Id. pp. 10–16.

14. Id. p. 25.

15. Id. p. 20.

16. Id. p. 17–21.

17. Id. p. 22–26.

18. Id. p. 27–32.

19. Id. p. 37–41.

20. Id. pp. 32–36.

21. Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954); Cf. United States v. Lubrano, 529 F.2d 633, 638 (2nd Cir. 1975); United States v. Brasco, 516 F.2d 816, 819 (2d Cir. 1975); United States v. Doe, 513 F.2d 709, 711–713 (1st Cir. 1975); United States v. Larkin, 417 F.2d 617, 618 (1st Cir. 1969); United States v. Flynn, 216 F.2d 354, 368 (2d Cir. 1954).

2. No "overture" or "proposition" was made by the appointed investigator, Fred Koerner, to No. 12 juror, Patricia Boyle, at any time during the trial or after she was excused.

3. Despite Pamela Perry's expressed impression to the court that Patricia Boyle was upset and scared by the telephone call from the investigator, Miss Perry told juror Mary Fagan that Miss Boyle was upset about her boyfriend's suicide.[22] Miss Boyle was not upset or scared about the investigator's telephone call.[23]

4. Miss Perry did not tell any juror that Miss Boyle was upset and scared by the investigator's call.

5. The communication between Miss Perry and Miss Boyle did not prejudice Miss Perry against the defendants and did not interfere with her finding of the verdicts.[24] See Gereau v. United States, 523 F.2d 140, 154 n.41.

6. The communication by the investigator to excused juror, Miss Boyle, did not enter into the deliberations of the jury in any way.[25]

7. Juror Charles Latcheran did not recall being told by Miss Perry of the investigator's telephone call to Miss Boyle, or that Miss Perry received a call from Miss Boyle, or called Miss Boyle.[26]

8. Neither Mr. Deiger nor Mrs. Fagan nor any other juror was informed that a telephone call to excused juror Miss Boyle emanated from an investigator for the defense.

9. The knowledge of a telephone call to Miss Boyle did not prejudice Miss Perry, Mr. Deiger or Mrs. Fagan against any defendant.[27]

10. Other than the three jurors named in finding 9, no other juror was informed about any telephone call to excused juror, Miss Boyle.[28]

11. There was no misconduct on the part of any juror and the defendants were not prejudiced.

12. The fact that in the circumstances the court held in camera interviews, if error, was harmless. Cf. United States v. Brasco, 516 F.2d 816, 819 (2d Cir. 1975); United States v. Doe, 513 F.2d 709, 711–713 (1st Cir. 1975); United States v. Larkin, 417 F.2d 617, 618 (1st Cir. 1969); United States v. Crisona, 416 F.2d 107, 119 (2d Cir. 1969); Tillman v. United States, supra, 406 F.2d at 936–938; Miller v. United States, 403 F.2d 77, 81–84 (2d Cir. 1968).

13. The defendants were not deprived of a fair trial and an impartial jury.

The fact that excused juror No. 12 had experienced a personal tragedy creates an inference that defendant Boscia contemplated the likelihood that a prompt telephone call from his investigator to the excused juror would be communicated by her to other jurors with whom she had become friendly and who might call to express sympathy; and this is exactly what happened. This tactic prompted every defendant including Boscia to move for a new trial.

Of decisive importance in determining there was no jury prejudice against the defendants is the fact that the verdicts found ten defendants guilty and one innocent. In addition, all of the convicted defendants but one were acquitted of several of the fourteen counts against each. Only two of the ten convicted defendants were convicted of three counts; three were convicted of four counts; and five were convicted of different numbers of counts ranging from two to fourteen. Verdicts such as these show an individualized evaluation of the evidence as it applied to each defendant. An individualized evaluation is inconsistent with the presence of wholesale prejudice against all the defendants.

**22.** *Id.* p. 38.

**23.** *Id.* pp. 13, 19, 35–36.

**24.** *Id.* p. 21.

**25.** *Id.* pp. 24, 25, 29, 30, 39.

**26.** *Id.* pp. 24–26.

**27.** *Id.* pp. 21, 30–31, 39–40. See *Gereau v. United States, supra,* 523 F.2d at 154 n.41.

**28.** *Id.* pp. 19, 39.

■ It is our opinion that the motions for a new trial based upon private conversations between excused juror No. 12, Miss Boyle and juror No. 11, Miss Perry, as communicated to two other jurors, John Dieger and Mary Fagan, should be denied. *United States v. Brasco, supra,* 516 F.2d at 819.

## ADDITIONAL ARGUMENTS OF DEFENDANT SCOLIERI

### ADMISSIBILITY OF DOCUMENTS FROM INSURANCE COMPANY FILES

Scolieri argues that the records of St. Paul were inadmissible in evidence as they violated the hearsay rule.

■ Title 28 U.S.C.A. § 1732 makes admissible in all judicial proceedings civil or criminal, records made in and pertaining to the regular course of business. *Wheeler v. United States,* 93 U.S.App.D.C. 159, 163, 211 F.2d 19, 23 (1953). All other circumstances of the making of such writing or record, including the lack of personal knowledge of the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. *Landay v. United States,* 108 F.2d 698, 705 (6th Cir. 1939).

Rule 803(6), Federal Rules of Evidence, specifically provides that business records collected in the regular course of business are not excluded by the hearsay rule.

■ The exhibits admitted in this case were identified by the custodian of the records and the business procedure used in the development of the records was fully presented. See Rule 901, Federal Rules of Evidence.

We think the St. Paul records were admissible.

### THE COURT'S ALLEGED FAILURE TO CHARGE ON COLLATERAL MAILINGS

■ Scolieri argues that he was prejudiced by the failure to charge as he requested with respect to collateral mailings. We think the charge accurately stated the law and left to the jury the issue of whether the specified mailings were in furtherance of an essential part of the fraudulent scheme.

### SUFFICIENCY OF THE MAILINGS

■ Scolieri argues that the mailings identified in the substantive counts were collateral to the scheme. The court dismissed five counts it thought were collateral. The remaining thirteen substantive counts were the subject of testimony and the facts so established provided an adequate basis for a finding by the jury that the mailings were in furtherance of an essential part in the execution of the fraudulent scheme. *Pereira v. United States, supra.*

### THE COURT'S CHARGE ON ACCOMPLICE TESTIMONY

Scolieri relies on *Cool v. United States,* 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972), as authority that the instructions were erroneous with respect to testimony of an accomplice. The prosecution called accomplices Cherubin, Ferris and Richmond to testify for the prosecution. Scolieri did not call an "accomplice" to testify in his behalf. Dr. Shapiro, Adams and Crivelli testified in their own behalf and they were defendants, not accomplices. *Cf. United States v. Sweeney,* 532 F.2d 747 (3rd Cir., decided March 23, 1976). We think the accomplice charge was correct.

### BROADENING THE INDICTMENT

■ We see no merit in Scolieri's argument that the court broadened the indictment by reading the statutes involved to the jury. The specific offenses charged were clearly identified and their elements stated.

## ADDITIONAL ARGUMENTS OF DEFENDANT CRIVELLI

### FAILURE OF COURT TO GIVE REQUESTED INSTRUCTION IN POINT NO. 13

Crivelli alleges error in that the court failed to instruct the jury according to Criv-

elli's point for charge No. 13 which was affirmed.

Counsel for Crivelli argued the substance of the point to the jury as he had a right to do.

Point 13 reads as follows:

"13. You are instructed that defendant Crivelli has not been charged by the government, in its indictment, with participating in the alleged mail fraud-conspiracy by virtue of the fact that Crivelli Chevrolet repaired defendant Scolieri's automobile. Although documents and testimony have been admitted into evidence relating to the repair of Scolieri's automobile, you are instructed not to consider this evidence in your determination relative to defendant Crivelli's innocence or guilt, but you may consider it relative to the government's contentions against other defendants."

During the trial on September 19th after the noon recess, at Crivelli's request, the court gave the following limiting instruction:

"Well ladies and gentlemen of the jury, Exhibit 8E has been admitted into evidence, Government's Exhibit 8E has been admitted in evidence, being an estimate of Crivelli Chevrolet for repairing a Chevrolet Coupe, and that exhibit has been admitted, but has not been admitted and has no bearing in the case of the government against Mr. Anthony Crivelli, Sr., because the government has not charged Anthony Crivelli, Sr., with submitting a false estimate for repairs, and he has not been charged with submitting any kind of repair bill. So although the exhibit is in evidence, it is no evidence against Anthony Crivelli, Sr. Is that satisfactory Mr. Martin?

Mr. Martin: Yes, that is satisfactory."

In the charge to the jury the court gave the following instruction:

"Mr. Crivelli wants you to believe that the Scolieri Chevrolet Caprice was badly in need of repair when it was brought to his repair shop; he wants you to believe that he had no idea that the accident was a fake, but on the other hand believed it

to be the real thing; that his company repaired the Caprice and the prosecution did not at any time accuse him of inflating the price of the repairs . . . .."

Nowhere was there any hint that the repair bill was inflated or otherwise fraudulent as was the rental agreement No. 265 marked "Paid in Full" by Crivelli and given to Scolieri who gave it to St. Paul which reimbursed Scolieri for a large portion thereof.

 In our opinion no harm was done to Crivelli in failing to read Point 13 verbatim. The prosecution had submitted approximately 24 points for charge and the defendants had submitted 50 points. Very few of the points were read verbatim to the jury.

Crivelli's motion for new trial based upon this alleged error is denied.

## ADDITIONAL ARGUMENTS OF THE DEFENDANT DeSANTIS

## FAILURE OF THE GOVERNMENT TO DISCLOSE THAT CHERUBIN FAILED TO IDENTIFY DeSANTIS

 DeSantis argues that the inability of Cherubin to identify a picture of DeSantis was exculpatory and that the prosecution failed to disclose that fact as *Brady* material prior to trial as ordered. Since DeSantis insisted through witnesses called on his behalf, that he was present and injured in the accident and was treated for those injuries, and that the claim he submitted to St. Paul was legitimate, Cherubin's inability to place DeSantis at the scene could not in any way have tended to exculpate him. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Cherubin's inability to identify DeSantis could be exculpatory only if DeSantis claimed that he had not been present and involved in the fake accident.

## ALLEGED WITHHOLDING OF MILANI RECORDS

DeSantis argues that the government intentionally withheld records in its possession belonging to Dr. Milani concerning alleged treatment of DeSantis.

It appears that records of Dr. Milani were included in a List of Materials supplied by the government to defense counsel prior to trial. All counsel had an opportunity to inspect and copy these records. Exhibit J in the List of Materials indicates counsel for DeSantis inspected the records on July 6, 1976 at 1:50 p. m. Furthermore, DeSantis was in no way prejudiced by his counsel not being aware of the Milani records as they were virtually identical to the documents contained in the insurance file, right down to the entries for treatment on days when Milani saw no patients. The jury determined the records were false,—hence they were not exculpatory. In any event we find there was no prejudice to DeSantis.

### ADDITIONAL ARGUMENTS OF THE DEFENDANT DR. POTTER

### ADMISSIBILITY OF EXHIBITS 7D AND 7E RE: FERRIS

Dr. Potter argues that government exhibits 7D and 7E were not sufficiently identified or authenticated.

It was definitely established that both documents were from the Ferris claim file of St. Paul. Carroll E. James testified that he was the custodian of the Ferris claim file and had delivered it to Postal Inspector Trainor. Nancy Greenawalt testified about the routine procedures used by the Pittsburgh claims office in the collection of documents relating to claims adjusted by the office. Miss Greenawalt also testified about the duties of Adams concerning the Ferris file and other files related to the November 25th "accident."

We think the testimony of the custodian and the person best qualified to establish the routine business procedures followed by St. Paul's Pittsburgh Office was sufficient to satisfy the requirements of § 1732 of Title 18, U.S.C., and Rules 803(6) and 901 of the Federal Rules of Evidence; in addition, the defendant, Dr. Potter, was identified by Frankie E. Frank, a handwriting expert as the author of the signature "J.D. Potter, M.D." on Exhibit 7D and of all the handwriting appearing on form 7E. Exhibit 7E, the bill, was also identified by Walter M. Taber, M.D., president of Henderson Clinic, as a standard form used by the Clinic in its routine business, and routinely paid and filed. Exhibit 7E, the bill, was not paid by Ferris nor filed with the Clinic. It was not paid by St. Paul to the Clinic.

Lastly, Dr. Potter testified in his own behalf and admitted that 7D was signed by him and that 7E was written by him. Accordingly, Dr. Potter's testimony with respect to Exhibits 7D and 7E precludes any question of authentication or identification of these exhibits at this point.

### MULTIPLE CONSPIRACIES

Dr. Potter argues that there was insufficient evidence to support his conviction on the conspiracy charge alleged in the indictment. He contends that although he may have been guilty of conspiring with Boscia and Ferris, the evidence failed to show his complicity in the broader conspiracy alleged in the indictment. He cites *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We think such reliance is misplaced. In essence, *Kotteakos* stands for the proposition that proof of numerous separate adventures of like character is not sufficient to satisfy the requirements of a common purpose single enterprise.

In the instant case, the involvement of all the defendants arose from a common scheme to defraud the insurance company through filing false claims allegedly arising out of a single motor vehicle accident on November 25, 1973. The evidence established that defendant Boscia was the orchestrator of the scheme. He procured virtually all of the participants including Dr. Potter who had been entertained on several occasions by Boscia posing as a junketeer in Las Vegas. And although Crivelli, Dr. Shapiro and Dr. Milani became members of the conspiracy by virtue of services they claimed to have provided to Scolieri, Iezzi and DeSantis, it was established that all three knew Boscia.

Unlike *Kotteakos,* the proof in the instant case was limited to one single enterprise in which each defendant participated to a degree. Proof of the scheme was the same with respect to all. The participation of Dr. Potter and some others only in the preparation of false documents used to further the scheme does not provide them the sanctuary of a separate conspiracy.

As was well put in the prosecutor's brief: "if in *Kotteakos* Simon Brown was the center of a rimless wheel which radiated separate illegal conspiracies, in the instant case Boscia was the center of a storm that focused upon a single criminal activity and drew into its common purpose all who were attracted to it, whatever their reasons."

*United States v. Bertolotti,* 529 F.2d 149 (2d Cir. 1975) upon which Dr. Potter relies is also not apposite. The indictment in *Bertolotti* alleged a series of transactions involving acquisition and distribution of drugs. Proof at trial showed the activities to be unrelated. In fact, some were shown to be cash thefts rather than drug dealings, *Bertolotti, supra,* 155. In these circumstances the court understandably reversed the conspiracy conviction. In the instant case, however, every action of the defendants was shown to be in furtherance of the common purpose, i. e., to defraud the insurance company.

Also Dr. Potter argues that there was insufficient proof that he knew the accident was staged. Dr. Potter's guilt, however, did not turn entirely upon his knowledge that the accident was a fake. It turned on whether he willingly and knowingly participated in a scheme to defraud. In this respect his preparation of a false medical report (Ex. 7D) and a false bill (Ex. 7E) for medical services which were not performed for Kenneth Ferris, but which services alleged were made necessary by injuries sustained in the November 25, 1973 accident, was critical to his guilt or innocence.

The jury had for its consideration the medical report, bearing Dr. Potter's signature, which reflected a history of the accident, a diagnosis of the injuries sustained, a report of x-rays allegedly taken at the Henderson Clinic on December 4, 1973, and treatment prescribed. The jury also had the Henderson Clinic bill (Ex. 7E) showing charges for x-rays, office visits, and eight days physiotherapy. In addition, the jury heard the testimony of Kenneth Ferris that this documentary evidence was false in that Ferris was never injured, was never treated by Dr. Potter in the Henderson Clinic and saw Dr. Potter only once when introduced to him briefly by Boscia so that Ferris and Dr. Potter would know what each other looked like.

The jury evidently did not believe Dr. Potter's account of his alleged free examination of Ferris at Boscia's request using the Clinic's facilities or the testimony of Mr. Perry Williams, business manager of Henderson Clinic, who attempted to explain how the signature of Dr. Potter could have been innocently placed upon the obviously false Ferris medical report insurance form, Ex. 7D.

Dr. Potter's argument that the evidence was insufficient to establish that he knew any medical report would involve use of the mails is without merit as the law requires only that use of the mails in furtherance of an essential part of the scheme be reasonably foreseen. *Pereira v. United States, supra.* Testimony of Mr. Perry Williams established that insurance cases represented a large part of the business of Henderson Clinic and that Dr. Potter's practice included treatment of many insurance claimants. When added to the fact that Ferris was a resident of Pennsylvania, these circumstances clearly were sufficient to support the jury's determination that Dr. Potter could reasonably foresee use of the mails in furtherance of the scheme.

The arguments of Adams have been heretofore discussed.

Boscia did not file a brief. We think Boscia's grounds for "Judgment of Acquittal, Arrest of Judgment, New Trial and Lack of Jurisdiction" contained in his motion have been heretofore disposed of or are without merit.

Appropriate orders will be entered denying the motions of all defendants.