**L. K. PETERSON and William H. Scott, Jr., Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 21353.**

United States Court of Appeals Fifth Circuit.

April 13, 1965.

William F. Walsh, E. Taylor Moore, Houston, Tex., for appellants.

Morton L. Susman, Asst. U. S. Atty., Houston, Tex., Woodrow Seals, U. S. Atty., Houston, Tex., for appellee.

Before WHITAKER,[*] Senior Judge, and RIVES and JONES, Circuit Judges.

RIVES, Circuit Judge:

Peterson is in the small loan business in Texas. Scott is a lawyer. Peterson was charged in Count 1 with attempting to evade a large part of his personal income taxes for 1958 in violation of 26 U.S.C. § 7201. Both Peterson and Scott were charged in Count 2 with stating falsely that $5,000 which Peterson paid to Scott was a legal fee "properly chargeable as an expense" on Peterson's 1958 income tax return in violation of 18 U.S.C. § 1001. After two mistrials, Peterson was convicted on Count 1 and both Peterson and Scott were convicted on Count 2.[1]

Peterson owned and operated five corporations [2] as loan offices in Houston, Texas, for making loans and collections. The management of and bookkeeping for these five corporations was handled by a proprietorship also owned by Peterson, entitled Finance Management Company. To avoid application of the Texas usury laws,[3] Peterson set up a "lender" proprietorship in the name of his head bookkeeper, Helen Hooper, later Helen Flora. After about two weeks of this arrangement, the "lender" company was taken out of Mrs. Flora's name and put in Scott's name. By assumed name certificates filed in the Harris County records, the names of two "lender" companies were so established, "Commercial Investment Company" and "Security Discount Company." The latter company was found to be not necessary and its funds were transferred to Commercial Investments Company. Peterson's five small loan corporations would then charge less than the statutory maximum as "interest," plus a "brokerage" fee for "finding" the lender. Scott would draw $50 a week out of Commercial Investments Company for the use of his name. The "lender" company had only one full-time employee, a woman, who always "approved" the loan on the telephone if

---

[*] Of the United States Court of Claims, sitting by designation.

1. Peterson was sentenced to a $5,000 fine on Count I and to 18 months' confinement on Count II, suspended for three years without supervision. Scott was sentenced to 18 months' confinement on Count II, suspended for three years without supervision. Scott will be disbarred if this conviction is affirmed.

Article 311, Vernon's Ann. Texas Civil Statutes.

2. Alamo Finance Company; Congress Investment Company; Credit Finance Company; Lincoln Loan Company; and Triangle Loan Service.

3. Based upon Constitution of Texas Art. 16, § 11, Vernon's Ann.St.; see Vernon's Civil Statutes of Texas, Arts. 1524a, 5071, 5073.

the "broker company" manager "recommended" it. The Texas enforcement authorities contended, and the Texas courts held that this "brokerage" plan was nothing more than a device for charging usurious interest and that the "brokerage fees" were actually interest.

We discuss below the rulings claimed to be erroneous in the order of their occurrence.

 1. *Severance.* No misjoinder of offenses or of defendants under Rule 8, Fed.R.Crim.P., is or can be claimed. The contention is that the district court should have granted a severance of defendants as relief from a prejudicial joinder under Rule 14, Fed. R.Crim.P. Whether to grant such relief is a matter committed to the sound discretion of the trial judge.[4] There have been comparatively few reversals for abuse of discretion in denying a severance.[5] The test is well stated by Judge Weinfeld in United States v. Kahaner, S.D.N.Y., 1962, 203 F.Supp. 78, 81, 82:

"The ultimate question is whether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct.[10] In

"10. Cf. United States v. Stromberg, 268 F.2d 256, 264–265 (2d Cir.) cert. denied, Lessa v. United States, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).

sum, can the jury keep separate the evidence that is relevant to each defendant[11] and render a fair and im-

"11. Cf. United States v. Lotsch, 102 F. 2d 35 (2d Cir.), cert. denied, 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500 (1939).

4. Opper v. United States, 1954, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101; Garcia v. United States, 5 Cir. 1963, 315 F.2d 679, 680; Schaffer v. United States, 5 Cir. 1955, 221 F.2d 17, 19.

partial verdict as to him? If so, though the task be difficult,[12] sever-

"12. Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953).

ance should not be granted."

 Without elaborating all the circumstances of this case, we hold that the district court did not abuse its discretion in denying a severance.

2. *Admitting Mrs. Flora's Former Testimony.* When the case was called for trial, the Government announced ready subject to the court's ruling upon the admissibility of the former testimony of the absent witness, Mrs. Helen Flora. The substance of her testimony was explained to the court by the United States Attorney as follows:

"MR. SUSMAN: This witness will testify as to both Counts 1 and 2 of the indictment. This witness was in the middle of all of these transactions and has first-hand knowledge.

"THE COURT: Was she employed? Tell me who she was.

"MR. SUSMAN: She was the head bookkeeper for Mr. Peterson, as I characterize her. However, she was present at a great deal of the negotiations and so forth concerning the representations alleged in Count 2 of the indictment against Mr. Scott. I believe that is a fair statement of her position."

Mrs. Flora had been present and had testified on each of the two earlier trials. Though duly subpoenaed, she was unavailable for the third trial because of pregnancy and its attendant complications. Her physician from Fort Pierre, South Dakota, was present and testified before the court that Mrs. Flora's pregnancy was not normal, and that she could not travel from Fort Pierre, South Da-

5. See e. g., Schaffer v. United States, supra n. 4; Everitt v. United States, 5 Cir. 1960, 281 F.2d 429, 433.

kota, to Houston, Texas, and testify before the jury without extreme risk to herself and the unborn child. As to when Mrs. Flora would be free to travel, the physician testified:

"A. With the past history I have on this lady, with the past difficulty this lady has had from the previous pregnancies, my answer to that would be probably after the baby is delivered. Her calculated date should be approximately September (the doctor was testifying on April 1). Whether she would be ready before the six weeks post-birth check, which is the time we usually follow them up there, and dismiss them, I couldn't answer. I imagine she would ask to breast feed, which I would recommend her not to, and that would delay a further four months follow up after she delivered the baby. But I would specifically request her not to travel for six weeks, if she carries the baby to term."

Upon further questioning, the doctor testified that her future travel was also conditioned on such unpredictable factors as whether or not she aborted, and whether or not she became pregnant again.

The Government offered to allow defendants' counsel to read to the jury such parts of the cross-examination of Mrs. Flora on both previous trials as they wished, and also offered to waive formal proof of the predicate required for the admission of additional impeachment testimony.

The Government had not tried to prove a conspiracy on the first two trials. As to the third trial, the United States Attorney stated: "At this time we have rearranged our tactics and we have done a little more research on the law and we are convinced there is a conspiracy that could be proved."

In arguing against a severance, the Government contended that the claimed conspiracy would make much of the evidence admissible against both defendants. When the court stated, "In effect, I am being asked to determine here and now whether or not a conspiracy exists," the United States Attorney responded: "We are prepared to do that with our first witness, Mrs. Flora, and we strongly urge the Court to hear the testimony and carry the motion along."

The court acquiesced in that suggestion, and stated:

"Upon the statement of counsel that the government will proceed immediately into the point of laying the predicate so that in the very early stages of the case the Court can make his determination as to the duration of the conspiracy, I will carry the motions with the case until the point is raised.

"I would admonish counsel, though, for the government, that we are running for the possibility of a motion for mistrial on the part of these defendants."

After hearing Mrs. Flora's testimony, the court confirmed its denial of the motions for severance, stating:

" * * * the Court has overruled your motion to sever, and as of this time, on the showing that has been made, and within the holdings and teachings of the cases that have been discussed here, the Court is inclined to the view that the conspiracy has been pretty well indicated insofar as admissibility is concerned, and would indicate it to have been in effect as of the time."

The Sixth Amendment to the Constitution provides that, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Rule 26 of the Federal Rules of Criminal Procedure provides that, "In all trials the testimony of witnesses shall be taken orally in open court * * *." It is well settled, however, that the literal language of the Constitution and of the Rule must sometimes give way to the simple necessities of the case. As said in the leading case of Mattox v. United States, 1895, 156 U.S. 237, 242, 243, 15 S.Ct. 337, 339, 340, 39 L.Ed. 409:

"The primary object of the constitutional provision in question was

to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law, in its wisdom, declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused." [6]

In Mattox v. United States, supra, the Court further held:

"The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of * * *." 156 U.S. at 244, 15 S.Ct. at 340.

After referring to that holding, Judge Fahy speaking for the D.C. Circuit said: "The rule thus approved assumes that the issue on the first trial is the same as on the later, otherwise the right of cross-examination has not been fully available." Christoffel v. United States, 1952, 91 U.S.App.D.C. 241, 200 F.2d 734, 742.

■ The St. Louis Court of Appeals, Missouri, made an admirable statement of the principle applicable to one phase of the present case in Evans v. Sears, Roebuck & Co., 1939, 129 S.W.2d 53, 57.

"* * * if it appears that the reception, at a succeeding trial, of evidence taken at a former trial would amount to a denial to the opposing party of the opportunity for full and complete cross-examination with respect to every issue in the case to which the testimony of the witness might properly relate, then such evidence is inadmissible at the succeeding trial and should be excluded by the court."

■ Under that principle, Mrs. Flora's testimony should not have been used to establish a conspiracy, an issue not presented on the two former trials, and as to which her testimony had not been tested by cross-examination.

■ More broadly, however, we are of the opinion that no sufficient basis was laid for the introduction of any of Mrs. Flora's testimony on the former trials. As has been quoted from the leading case of Mattox v. United States, supra, one object of the constitutional

---

6. See also Motes v. United States, 1900, 178 U.S. 458, 471, 20 S.Ct. 993, 44 L.Ed. 150; Rule 511, A.L.I. Model Code of Evidence; 5 Wigmore on Evidence, 3d ed., § 1401 et seq.; 20 Am.Jur., Evidence § 686 et seq.; 31A C.J.S. Evidence § 384 et seq.; 2 Wharton's Criminal Evidence, 12th ed., p. 281, § 479; 3 Jones Commentaries on Evidence, 2nd ed., p. 2170, § 1184.

provision is to give the accused an opportunity to compel the witness "to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." [7]

Mrs. Flora was not dead, beyond the reach of process nor permanently incapacitated. She was simply unavailable at the time of trial because of her pregnancy. Considering the seriousness of the charges and if the Government desired to use Mrs. Flora's testimony, it should have requested a continuance to a time when she could probably be present. In 20 Am.Jur., Evidence § 704, p. 591, it is said:

> "In criminal prosecutions, according to the weight of authority, the mere temporary illness or disability of a witness is not sufficient to justify the reception of his former testimony; it must appear that the witness is in such a state, either mentally or physically, that in reasonable probability he will never be able to attend the trial." [8]

Professor Wigmore prefers a less rigorous rule: "The *duration* of the illness need only be in probability such that, with regard to the importance of the testimony, the trial cannot be postponed." 5 Wigmore on Evidence, § 1406(a), p. 158. We need not prescribe in this case the exact dimensions of the rule, for under either statement, the Government should have been required to elect either to proceed without Mrs. Flora's testimony or to request a continuance. For the error in admitting the testimony of Mrs. Flora at the former trials the judgments of conviction must be reversed.

### 3. Court's Instructions to Jury as to Count 1.

On Count 1 charging income tax evasion, Peterson insisted that under Texas law all payments of usurious interest must be applied against the principal and cannot be treated as income. The court charged the jury at some length on this issue, but its instructions may be briefly summarized in a few quotations: " * * * each payment upon a contract affected with usury is a payment upon the principal." "And if I understand correctly, then, and I so advise you, that the monies paid back would not become income under the law until the full amount of the loan had been paid. After the full amount of loan had been repaid, then under the Federal Income Tax law, as I interpret it, the payments thereafter would become income and reportable after they were received." As to payments not in excess of the principal amount loaned, the court left it to the jury to determine whether such payments should be treated "as brokerage or some other fee or character of payment," in which event they would be treated as income, or as interest, which would be applied to the principal and would not be income. We think that the jury should not have been left free to make such a choice, for we agree with the Texas administrative authorities and the Texas courts that the "brokerage" plan was a transparent device for charging usurious interest.

There is no dispute as to how payments in excess of the principal amount loaned should be treated. Peterson's principal reliance is upon a 1925 Solicitor's Memorandum numbered 4591, published in In-

---

**7.** It is significant that in the present case, the court charged the jury:

> "We normally think that if a witness looks you in the eye while he or she is on the stand, and if they tell a straightforward story, and if they give the appearance and demeanor on the stand of being an honest, straightforward type of person, if their story makes sense or sounds reasonable, we think those are

indications that that person is a credible witness."

The jury did not have the benefit of that test of credibility of Mrs. Flora's testimony.

**8.** In addition to the authorities cited to the text, see Smith v. United States, 4 Cir., 1939, 106 F.2d 726, 728; Tanner v. State, 1958, 213 Ga. 820, 102 S.E. 2d 176, 178, 179.

ternal Revenue Cumulative Bulletin IV-2 at pages 160–161, which opined:

"Inasmuch as the decisions of the Texas courts hold that each payment made upon a contract affected with usury is a payment upon the principal, applied by law, notwithstanding it was paid and received as a payment of interest, a taxpayer in Texas who lends money at usurious rates need not report as income any amounts received with reference to such debt until the amount of money loaned has been returned to him. All payments received in excess of the amount loaned are income."

The Government, of course, agrees that payments received in excess of the amount loaned are income. As to earlier payments, the Government relies upon Sec. 1.61–7 of the 1958 Federal Tax Regulations, which provides:

"§ 1.61–7, *Interest*

"(a) *In general.* As a general rule, interest received by or credited to the taxpayer constitutes gross income and is fully taxable. Interest income includes * * * usurious interest (unless by State law it is automatically converted to a payment on the principal) * * *."

■ The Government insists that under that Regulation all of the payments of usurious interest were income, and hence that any error in the court's charge on this issue was without prejudice to the defendant Peterson. Resolution of the question depends upon the law of Texas for it is settled that, "the taxability of amounts received as usurious interest depends upon the applicable state law." 1 Mertens Law of Federal Income Taxation § 6A.01, Chap. 6A, p. 6.

The Government insists that in 1935 the Texas law on this question was clarified to show that payments of usurious interest are not automatically converted to

payments on the principal, but that the method of treating interest paid on a usurious contract is optional with the borrower. The Government relies on Adleson v. B. F. Dittmar Co., Comm'n of App. of Tex., opinion adopted by the Supreme Court, 124 Tex. 564, 80 S.W.2d 939, 941 where it was said:

"* * * it is not entirely accurate to say since the enactment of the penalty statute in 1892, that payments of interest on a contract affected with usury are by law applied to the principal. The borrower is entitled to have them so applied if he desires it, but he may prefer to sue for penalties under article 5073 on account of such payments. He may within two years from the time the payments were made assert the right to such penalties, even though the principal or a part of it is unpaid, and may offset the penalties against the principal. Rosetti v. Lozano, 96 Tex. 57, 70 S.W. 204; Yonack v. Emery (Tex.Com.App.), 13 S.W.(2d) 667, 70 A.L.R. 684. Of course he is not entitled to resort to both remedies, that is, the application to the principal and the collection of penalties, on account of the same payments of interest. The usual practice is to claim the right to have interest payments made more than two years before the filing of the suit applied to the principal and to recover penalties for the interest payments made within the two-year period. In such practice one remedy is resorted to as to some payments and the other remedy as to others. When this is done, there is no inconsistency and no election is required. Sugg v. Smith (Tex.Civ. App.) 205 S.W. 363 (application for writ of error refused); Temple Trust Co. v. Stobaugh (Tex.Civ. App.) 59 S.W.(2d) 916, (application for writ of error dismissed)." [9]

---

9. See also Temple Trust Co. v. Haney, Civ.App.Tex., 1937, 103 S.W.2d 1035, 1040, 1041, aff'd Tex.Sup.Ct., 1937, 107 S.W.2d 368; Robertson v. Connecticut General Life Ins. Co., Civ.App.Tex., 1940, 140 S.W.2d 936, 939, 58 Tex.Jur. 2d Usury, § 43, pp. 122, 123.

The fallacy in the Government's theory is that it fails to take account of the time at which the borrower may elect as to how his payments of usurious interest shall be applied. That is made clear by the last Texas decision which we have located:

"Appellee had a right to have his payments applied first as credits on the principal. He is entitled to this right though he may not at the time of payment have directed how his payments should be applied, for the law will, as between a legal and an illegal debt, apply payments in the absence of direction, on the legal debt. Southern Industrial Corp. v. Harris, Tex.Civ.App., 22 S.W.2d 494, 495; Temple Trust Co. v. Stobaugh, Tex.Civ.App., 59 S.W.2d 916; Adleson v. B. F. Dittmar Co., 124 Tex. 564, 80 S.W.2d 939; Robertson v. Connecticut General Life Ins. Co., Tex.Civ.App., 140 S.W.2d 936, 42 Tex.Jur. 951, 958–959; Ware v. Paxton, Tex.Civ.App., 266 S.W.2d 218."

United Finance & Thrift Co. of Dallas v. Farr, Civ.App.Tex., 1962, 359 S.W.2d 219, 220.

 It follows that in the absence of direction by the borrower it still remains true as advised in Solicitor's Memorandum 4591 that " * * * a taxpayer in Texas who lends money at usurious rates need not report as income any amounts received with reference to such debt until the amount of money loaned has been returned to him." We conclude, therefore, that the error of the district court in leaving to the jury whether such payments should be treated as income was prejudicial to the defendant Peterson.

4. *Court's Instructions to Jury as to Count 2.*

Scott and Peterson insist that neither of them can be guilty under Count 2 because Scott's letter containing the alleged false statement was literally true. That letter read:

"You have inquired as to whether the $5,000.00 paid to me on or about October 7, 1958, was for past earned fees or for fees to be earned in the future for purpose of filing income tax return.

"Please be advised that my records reflect that this payment was for fees that had already accrued and accordingly said sum paid by Mr. Peterson is properly chargeable as an expense for the year 1958."

The statute proscribes the knowing and willful making of "any false, fictitious or fraudulent *statements or representations.*" (Emphasis supplied.) 18 U.S.C. § 1001. Count 2 charges the defendants with "falsely and fraudulently stating and representing and causing to be stated and represented that in connection with the income tax matters of defendant LYNN K. PETERSON the sum of Five Thousand ($5,000.00) Dollars paid on October 7, 1958, by LYNN K. PETERSON to WILLIAM H. SCOTT, JR., was for legal fees and was properly chargeable as an expense on LYNN K. PETERSON'S income tax return for the calender year 1958. * * *"

Appellants argue: "But that letter did not say that the $5,000 was a legal fee. By its terms it said that Scott's 'records reflect that this payment was for fees. * * *'"

 Even if the literal language of the letter were true, it was clearly open to the jury to find it to be a *representation* that the $5,000 payment actually was for past earned fees properly chargeable by Peterson as an expense for the year 1958.

 Further, there was evidence that many deposits made to Scott's law office account were not fees, but were funds received for other purposes. Whether the letter was even literally true was a question for the jury.

The trial strategy adopted by defendant's attorneys as to Count 2 was to contest only the question of whether the

$5,000 was an attorney's fee or a mere transfer.[10]

The district court accordingly confined the jury's consideration to that one question, charging: "If you determine that it was not a legal fee, then you would find the defendants guilty on this Count Number Two. If you determine it was a legal fee, then you would, of course, find them not guilty."

In so charging the jury the court erred. It must instruct the jury on all of the essential elements of the offense. Merrill v. United States, 5 Cir., 1964, 338 F.2d 763, 767.

For the errors discussed the judgments of conviction are reversed and the cases remanded.

Reversed and remanded.

10. They argued to the jury:
"If you believe that this $5,000 was an attorney's fee, then you will acquit both the defendants in the count charging an offense with reference to the writing of this letter, because the letter was not a false letter, it was a true letter.

"He simply wrote a letter. We are not ducking and dodging. He knew when he wrote that letter that that letter was going to be turned over to some agent of the United States Government as evidence that Mr. Peterson had paid him a $5,000 fee, and there wasn't any ducking and dodging about it."