**UNITED STATES of America,**

v.

**James Raymond FAISON, Defendant.**

Crim. No. 80–375.

United States District Court,
D. New Jersey.

April 7, 1983.

W. Hunt Dumont, U.S. Atty. by Michael M. Milner, Asst. U.S. Atty., Newark, N.J., for U.S.

John F. McMahon, Federal Public Defender by David A. Ruhnke, Asst. Federal Public Defender, Newark, N.J., for defendant.

OPINION

BIUNNO, Senior District Judge.

This case is before the court on an evidentiary hearing directed to be held pursuant to judgment in lieu of mandate issued by the U.S. Court of Appeals for the Third Circuit and filed here July 7, 1982. That mandate vacated defendant's conviction and remanded for further proceedings to determine whether a government witness, not available to testify at trial because of then existing physical illness or infirmity, Fed.Ev.Rule 804(a)(4), is now "available" to testify. If he is, this court was directed to grant a new trial. "If his health is such that he would be unavailable at a new trial, granting a new trial would serve no purpose. Faison already had a trial at which Mancuso's prior testimony was read to the jury." See *U.S. v. Faison,* 679 F.2d 292 (CA–3, 1982).

An evidentiary hearing on the question of Mancuso's present "availability" has been conducted, with elaborate gathering and presentation of medical fact materials (past

medical records plus reports of medical examinations and tests conducted and evaluation of records by four physicians since the remand) as well as expert medical testimony.

After careful review, the court finds that the witness Mancuso is not available to testify because of serious physical and mental illness, and that he is not likely ever to be so available. In arriving at its finding, the court has assumed that "unavailability" must appear beyond a reasonable doubt, and that no consideration need be given to the management of the court's calendar or to the Speedy Trial Act, 18 U.S.C. § 3161, et seq. In so doing the court does not decide whether the "beyond a reasonable doubt" standard applies, or whether the requirements of the Speedy Trial Act are to be considered. If the test applied is not required, its use is favorable to the defendant, and if the Speedy Trial Act were considered, it could only be to defendant's disadvantage.

*The Medical Materials*

The existence of a health problem for Mancuso first came to the court's attention on January 5, 1981, when he appeared with his lawyer to withdraw his not guilty plea to Count 1 of the superseding indictment filed November 20, 1980 and to offer a guilty plea thereto under an agreement pursuant to F.R.Crim.P. 11 that contemplated dismissal of the other counts at sentence. The transcript of that plea was filed January 8, 1981.

In the course of the allocution when a plea of guilty is tendered, the court invariably asks questions to satisfy itself of the party's ability to participate intelligently in the hearing, and these questions are designed to elicit the possible effect of current medication or other treatment. In the course of this questioning, Mancuso stated that he had had 6 heart attacks.[1]

The matter came up again on February 17, 1981 (after Faison's first trial had ended in a mistrial) when Mancuso was sentenced to the maximum authorized by law and for a study pursuant to 18 U.S.C. § 4206(c) and (d). Execution of the sentence was stayed so that the study could be performed locally. The medical background was mentioned on the record along with time constraints in obtaining necessary information for sentence.[2] This transcript of sentence was filed March 13, 1981.

1. The colloquy on this subject was as follows:
   Q. Are you now in the care of any physician or psychiatrist for any kind of condition? A. I'm under the care of a heart doctor. I've had six heart attacks.
   Q. Do you have to take any medication? A. Yes, I do.
   Q. Daily? A. Yes.
   Q. Do you know what it is? A. Inderal and Isodril.
   Q. What are they, diuretics? A. For the heart.
   Q. Antihypertensive? A. Something like that.
   Q. Do you take that in the morning? A. Take that in the morning.
   Q. Did you take it today? A. Yes.
   Q. Does taking that medication in any way prevent you from understanding what you're doing and what's going on? A. No, I don't believe so.
   Q. There is some medication where you get drowsy or sleepy or inattentive. I'm trying to make sure that you're not under any such handicap. A. No, I'm not taking any sedatives.
   Q. Have you ever been treated for the use of drugs, narcotics addiction? A. No.

   Q. Either in a hospital or outside of a hospital? A. The only thing that they have given me in the hospital—
   Q. I mean treated for, a drug user. A. No, never.
   Q. Are you mentally able to understand today's proceedings? A. Yes.
   [Trans. 1/5/81, p. 4 line 25 to p. 5, line 10]

2. Relevant excerpts from the initial sentence transcript of February 17, 1981 are as follows:
   THE COURT * * * I'm puzzled by the involvement of Mr. Mancuso. I have reread his plea transcript as to what happened, and, of course, it's more of a summary than the full details that I heard when he testified and saw the exhibits, et cetera [p. 2, lines 18–21] * * * I'll have to work out with the probation office just what facilities are available around here, what means for inquiry can help me get more information about him as an individual [p. 3, lines 1–4] * * * It has been a very tight stretch and I simply haven't had time or probation hasn't had time to search out the things I need. [p. 3, lines 10–12] * * * There are some things about him that trouble me. I've read the medical reports, and as far back as 1972, when he was at Cleveland

Another "unavailable witness" problem surfaced in that period. When the first trial ended in mistrial on January 30, 1981, the date for retrial was set for February 17, 1981. On that date, Mr. Faison did not appear [3] and he was ordered to appear on February 18th, since the court had questions about his compliance with bail conditions. On the 18th, an extended trial in *U.S. v. Calzone,* Crim 80–396, was still in progress and the court reset the trial date for March 2nd. The United States said that date would be a problem because one of its principal witnesses, SA James Lott (the "banker") was scheduled to be hospitalized for a hernia operation on the 3rd. Since he would not be the first witness, the court set the 10th, when a jury could be drawn. See Trans. 2/18/81, p. 12, line 16 to p. 13, line 11.

The next event was the receipt of a phone call to chambers by AUSA Milner on March 4, 1981 reporting that the witness Mancuso had had a heart attack and that the trial could not go on for March 10; he was instructed to report the matter on the record on March 10 or before, but to have a medical report with diagnosis, treatment, prognosis and prior history. This was made part of the record by the Memorandum (Item 39) and Memorandum Order (Item 40) filed March 5th.

Further medical materials were provided at the hearing of March 10, 1981, including the information that Mancuso was confined to his hospital bed in Valley Hospital, would be transported by ambulance on the 17th to St. Luke's, and that bypass surgery would be performed March 20, 1981.

On March 13th, before the jury was drawn that day [4] further medical data was provided, from which it appeared that Mancuso had been discharged from Valley Hospital to bed rest at home. Since Faison's attorney renewed the request to adjourn on the ground that some questions that might have been asked on cross-examination had not been, the court suggested that he get in touch with Mancuso's physician to see if the additional questions could be asked by deposition, possibly with the physician present (Transcript excerpt, 3/13/81, p. 7, line 19, which should begin with "THE COURT", to p. 9, line 9).

[Note: It was claimed that Mancuso had made some statements during his plea proceedings on January 5, 1981 that were inconsistent with his later testimony at the first trial. Any such item, including any

---

Clinic, one of the items that was listed for treatment is to get his weight down to 160. You're about 185; aren't you? MR. MANCUSO: Yes. THE COURT: Why don't you follow orders? That's seven years ago. MR. MANCUSO: It's hard. I stopped smoking. THE COURT: That was the next thing I was going to ask you. When did you stop smoking? MR. MANCUSO: About a year and a half and it has been terrible. THE COURT: You have to reduce your eating. That does the same thing. MR. LUCIANNA: He likes pasta every now and then, Judge. THE COURT: You have to eat less. MR. MANCUSO: I'm trying. [p. 3, lines 18–25; page 4, lines 1–11] * * * MR. LUCIANNA: The main thing is: if your Honor please, his weight. This will give him an opportunity to lose some weight. I hope when he appears before you at the time of sentence, he will be as thin as I am, if not thinner. [p. 8, lines 21–25] * * * Mr. Mancuso will be available for the retrial of Mr. Faison. [p. 9, lines 17–18]

3. His failure to appear was due to instructions from his attorney based on a telephone inquiry by him to chambers staff of which no written record was made. The court had no knowledge of it and firmly disapproved the practice when the attorney appeared on the 17th. The transcript, received March 4, 1983, had not been available before.

4. The transcript of March 13, 1981, other than for an excerpt of 18 pages at the start of the day and not filed until March 2, 1982 (Item 59), was never ordered. This included the start and completion of the voir dire of the jurors, and so marks the start of the trial under sec. II(4)(e)(3) of the District Plan for Speedy Trial, although the trial begins for double jeopardy purposes when the jury are empaneled and sworn, *Crist v. Bretz,* 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). When this court learned that the jury selection had not been transcribed, along with the rest of the day's proceedings, it instructed that one be prepared. It has not yet been provided because the CSR who took the proceedings is so far "unavailable", having moved to a mid-Western state and efforts to locate her have been so far unsuccessful.

statement of like nature made during his initial sentencing proceeding on February 17, 1981 could have been offered to attack his credibility at the second trial, without being subject to "any requirement that he may have been afforded an opportunity to deny or explain". See Fed.Ev.Rule 806. No such offer was made during the second trial although both transcripts were on file.].

On March 17, 1981, the day that the jury were sworn and the taking of testimony began, a further statement from Mancuso's doctor was tendered, but it was not filed because the certification was not signed (Trans. 3/17/81, p. 2.2 line 15 to p. 2.3, line 23). It was later signed and filed on March 18th.[5]

After Faison's second trial, it was found necessary to postpone sentencing after study of Mancuso because of the medical reports received July 15, 1981, and it was not until October 8, 1981, that he was called for sentence.

At the time of sentence, as the transcript discloses, it was only the element of Mancu-

so's precarious condition of health that led the court to impose a probationary sentence and a fine. All other factors, even after giving recognition to his readiness to concede his participation and to come forward to testify, called for a sentence with some custodial time. Not only had Mancuso drawn in another person, Selvanto, by enlisting him to cash the stolen checks (not aware that Selvanto promptly reported the approach to a law enforcement officer in Staten Island, who recommended that he get in touch with the FBI when he learned that the stolen checks had come from New York to New Jersey), but he had been the one who placed forged signatures on four of the checks, using as a guide a genuine cancelled check that had cleared the bank.

All of this material, including the ongoing medical reports which had been submitted through the probation office before sentence on October 8, 1981, was known to the trial court but was not available to the Court of Appeals when the oral argument was presented nearly 6 months later on March 29, 1982.[6]

**5.** The court then reviewed the transcript of the Mancuso testimony from the first trial and informed both sides of the passages that would not be read, or of names that would not be identified, and other editorial treatment not of substance. Trans. 3/17/81, p. 2.3 line 24 to p. 2.6 line 16.

**6.** In some respects, this hiatus in material available to the Court of Appeals is not unlike the situation that developed in *DeTore v. Local No. 245*, 615 F.2d 980 (CA–3, 1980). In that case the panel vacated the summary judgment in favor of the municipal defendants and remanded for articulation of reasons. As the opinion after remand discloses, 511 F.Supp. 171 (D–N.J., 1981), the trial court had in fact articulated its reasons at two hearings held before the order was entered, but neither side had arranged to order transcripts of those hearings. The opinion after remand meticulously summarizes what those transcripts would have shown. Similarly in this case, had the materials in the hands of the trial court up through the Mancuso sentence been gathered by one side or the other so that the Court of Appeals could have had what the trial court had, it may not have been necessary for the Court of Appeals to say, on the one hand, that "the refusal to adjourn may have been warranted", that "the court did not articulate any weighing of the relevant considerations", that "[w]hether he [Mancuso] has

recovered sufficiently to testify is not known", and on the other hand to vacate and remand, not for the articulation of reasons but to conduct an evidentiary hearing to determine "whether Mancuso would *now* be available to testify," (Emphasis added).

The importance of having the trial attorney present the oral argument on appeal was pointedly emphasized by the late Justice Harry Heher in his lecture in the series to familiarize the bar with the then new 1948 Rules of Court in New Jersey. He said:

Too often counsel will say, when a question is put by the court, "I don't know the answer to that question. I did not try this case below." That statement does not merely establish counsel's ignorance of the record. It also convicts him of negligence in preparation, for counsel should never appear before the court without a full knowledge of the record. It is the most elementary of counsel's duties to the court and to his client.

I like to see the young men come in and argue their cases. Too few of them do. They seem to fear that brief writing and oral arguments are something beyond their sphere. It is a new experience for the young man. He feels he isn't equipped for it and so he hesitates and too often retains someone else. Counsel so retained makes the argument but he does not always know as much

In any event, promptly after the filing of the judgment in lieu of mandate, this court issued an order, filed July 19, 1982, to begin arrangements for the evidentiary hearing. It must be said that the process has taken considerably longer than the court's efforts intended.[7] Traditionally, the presentation, consideration and decision of such preliminary questions as "unavailability" are conducted without application of formal evidence rules and usually on the basis of affidavits. See the extensive discussion in *Howard v. Sigler,* 454 F.2d 115 (CA–8, 1972) which is in light of the then proposed (but not yet enacted) Federal Evidence Rules.

[Note: The Federal Evidence Rules were adopted by Act of Congress, Pub.L. 93–595, January 2, 1975, one day before enactment of the Speedy Trial Act, Pub.L. 93–619, January 3, 1975 and now 18 U.S.C. § 3161, et seq. Since both are Acts of Congress they are to be construed as such, free of concerns that sometimes affect the interpretation of rules of procedure promulgated by the Supreme Court under 18 U.S.C. § 3771 (Criminal), 28 U.S.C. § 2072 (Civil) and § 2075 (Bankruptcy). For a brief account of the history of the adoption of evidence rules, see *Wearly v. F.T.C.,* 462 F.Supp. 589, at 595–597 (D–N.J., 1978)].

Despite this well-established practice, the court felt it should proceed in a more formal fashion. First to be done was a current examination of Mancuso by his regular physician, who was to be provided with a copy of the testimony of his patient (but evidently was not for some unknown reason). If his report indicated that the witness was now unavailable, defendant was to be provided an opportunity to have the witness examined by his own expert. If the views were conflicting, the court would decide the next step.

The underlying medical data in the first two reports is essentially the same; the evaluation and opinion are different. Mancuso's physician felt he could not safely be called to testify. The defense expert felt he could. So, the court appointed an independent expert under Fed.Ev.Rule 706, who thought the witness could testify but with qualifications and subject to precautions.

At the evidentiary hearing held January 31, 1983, these three physicians plus a fourth (the cardiac specialist who had consulted with Mancuso's internist in the past and in connection with the current tests) were sworn and testified.

So far as the cardiac background is concerned, the medical records are uniformly read by the physicians to disclose a history of a number of heart attacks going back to about age 37 (Mancuso is now about 58). There clearly is scar tissue from myocardial infarctions, and severe coronary artery disease. About midway in this time span, or in 1972, he was admitted to Cleveland Clinic for extensive tests and these showed the existence of coronary artery disease with poor myocardial reserve (the myocardium is the heart muscle proper, and is the mid-layer of the heart wall, with the epicardium as the outer layer and the endocardium as the inner layer). The recommendation was that coronary artery by-pass surgery not be performed and that conservative management be relied on. This study was done after there had been a myocardial infarction in January, 1972. Another acute myocardial infarction occurred in October, 1979,

about the case as the young man who tried it in the court below.
THE NEW PRACTICE, "Appellate Briefs and Oral Argument" Morris M. Schnitzer, Editor (Gann, 1949), page 366.

7. The question whether a witness is "unavailable" within the definitions of Fed.Ev.Rule 804(a), is a preliminary question or predicate for the admissibility of the recorded testimony of that witness under Fed.Ev.Rule 804(b)(1). Since this arose in a retrial of the same case against the same defendant, problems of identity of issues, of parties, and the like, which can arise in other circumstances, do not exist. Thus, the issue of "unavailability" is one to be dealt with under Fed.Ev.Rule 104. See the Advisory Committee Notes, giving as an illustration, "Is a witness whose former testimony is offered unavailable?" See also the provision on the use of depositions in criminal cases, which is tied in to Fed.Ev.Rule 804(a), as set forth in F.R.Crim.P. 15(e), and see, also, F.R. Crim.P. 26 (1972).

and there were other cardiac incidents and admissions to hospitals.

At the time of his admission to Valley Hospital in late February, 1981, shortly before the second trial, coronary arteriography indicated 3-vessel disease, and a thallium scan showed a large inferior wall defect. However, when the surgeon opened the left anterior descending artery he could find no lumen (i.e., there was essentially complete blockage) and no by-pass graft could be made there although the primary indication for surgery was its 70% to 90% obstruction.

After recuperating at home he was readmitted to the hospital in May, 1981 with what was diagnosed as "pectoral muscle syndrome". In June, 1981 an exercise tolerance test was performed and it indicated a moderately large infero-posterior defect which did not decrease much with redistribution. This is described as suggesting that myocardial ischemia and definite EKG changes are induced with minimal exercise. The test involved 5 minutes of exercise after which the patient reported he was ready to collapse.

The family history indicates the commonly understood importance of having ancestors with large blood vessels (pipes). Mancuso's mother, two maternal uncles and a sister have died of myocardial infarction at ages ranging from 52 to 63.

Historically the infarctions, or at least some of them, have occurred in association with major emotional stress and tension. His capacity to endure physical stress improved gradually after recuperating from the March, 1981 surgery and in recent months had declined.

Mancuso's personal physician and his cardiologist consultant regard his condition as precarious. An informative colloquy between that cardiologist and the independent expert (also a cardiologist) indicated that while they disagreed about the accuracy and dependability of several kinds of tests to evaluate the condition of the heart (a disagreement the court need not attempt to resolve), the end evaluation was not very different. The independent expert's evaluation was expressly qualified as applicable for the next 3 months (or until April 12th or so), and it was offered with reasonable confidence but not with absolute certainty because Mancuso has severe coronary artery disease with poor left ventricular function.

He also stipulated that medication (sublingual or chewable nitrates) be administered before any pretrial meetings with the lawyers and before testifying. He also assumed that if any objective or subjective change should occur while giving testimony, the process would stop immediately and not resume until there had been additional evaluation.

None of the physicians had experienced appearing in a courtroom before a jury to give testimony except defendant's expert, who has so testified many times. The witness' own physician said he had testified once, in a workers' compensation case (which is non-jury). None had testified in a case in which he was a co-defendant who had pleaded guilty and was testifying at the trial of the other defendant in connection with crimes he had himself engaged in. Even so, all the physicians confirmed that in view of Mancuso's condition anything could happen. Any episode occurring as the result of giving testimony could have serious consequences including death.

The independent expert clarified his report by saying that in recommending both advance medication and the immediate termination of testimony if there should be any subjective or objective change in the witness' clinical status while testifying he did not mean to imply that a physician should be nearby and on hand, with appropriate equipment. What he meant by the qualification was that if there were any clinical change during testimony "then it was an entirely new ball game."

The evidence also is that there is no way of testing the emotional stress of testifying. The next best thing is to apply physical stress (treadmill).

If Mancuso experienced cardiac arrest while testifying, it would be advisable to have a physician available probably with a defibrillator on hand. If he had an angina

attack during the hearing although merely observing in the audience and not testifying it would indicate that emotional stress had an effect on him and had caused angina, the equivalent of a myocardial ischemia.

The two-vessel coronary artery bypass surgery of March, 1981, while the third vessel could not be bypassed, did improve the delivery of oxygen and blood to his heart but did not improve his ventricular function.

The record of the hearing also discloses that Mancuso twice left the room due to distress although he was merely sitting in the audience listening and not testifying. On the second occasion his physician saw him leave, followed him out and treated him. Testimony was taken from both the physician and Mancuso in this regard.

The court also has the benefit of having observed Mancuso a number of times in the past, beginning with his arraignment in 1980, the guilty plea proceedings in early January of 1981, his testimony at Faison's first trial, his initial sentence for a study in mid-February, 1981, and at the final imposition of sentence on October 8, 1981.

The observation of the Court of Appeals that: "Appearance at a major criminal trial, particularly when a witness, such as Mancuso, was personally implicated in the events, must be an emotional and traumatic experience." 679 F.2d, at 296, was correct. It is true of victims as well. Both participants and victims testify under considerable emotional stress which is plain to the seasoned observer even when the witness outwardly appears to be relaxed and calm. In the case of Mancuso, the court's recollection is that he was under emotional stress which he was able to manage.

The question for the court to decide is whether he could manage it again, given the severe left ventricle problem and the advanced coronary artery disease, allowing for the partly successful by-pass surgery.

Mancuso's personal physician who has seen him the longest, and his consulting cardiologist, testified that they would advise Mancuso not to testify voluntarily and evaluated the risk to his health as a 50–50 chance. The independent expert, asked a hypothetical that assumed Mancuso was his patient and that he was responsible for his care and treatment, said that his opinion would depend on how "active" Mancuso's angina was. If he were having a lot of angina very frequently with minimal stress (either physical or emotional), he would say that he shouldn't even prepare an affidavit, much less testify in court. If there were not recurrent severe frequent angina, then he could do both.

Defendant's expert, asked essentially the same hypothetical, said that in effect Mancuso had been his patient, but did not directly answer the hypothetical.

All of which, as summarized, puts the issue in the hands of the fact-finder who must, in the end, arrive at a conclusion on the facts of record, aided in varying degree by the explanations and opinions (including opinions on the ultimate fact) provided by the experts.

*The Nature of the Question*

There are very few reported decisions dealing with the meaning of "unavailable" in the context of presently existing physical or mental disability. This is so even though it is one of the oldest and most widely recognized grounds for receiving some acceptable substitute in the form of hearsay. Testimony already given in the trial of the same case, with full opportunity to cross-examine and its actual use, no doubt ranks highest on the scale of reliability and in terms of satisfying concerns of confrontation.

As some scholars have observed, the rule at common law tailored the definition of "unavailability" according to the kind of hearsay that satisfaction of the condition would allow to be received. For a dying declaration, the witness had to have died. For former trial testimony, however, the condition was satisfied if the witness had died, was physically unable to attend trial, was mentally incapacitated, was rendered incompetent by statute, or had a privilege not to testify which was claimed and sus-

tained.[8] The current view is that specific exceptions should not be linked to particular causes of unavailability. So long as the proponent of the out-of-court statement is not responsible for the declarant's absence, neither the need for the declarant's statement nor its reliability is likely to vary with the cause of the unavailability. This is incorporated in the federal rules. See, Lampert & Saltzberg, A Modern Approach to Evidence, "Hearsay", p. 448, col. 1.

This change reduces the number of useful reported cases since very few have been reported since the Evidence Rules were adopted in 1975, and those that deal with illness (other than the present one) precede that change and apply one or another variation of the common law approach.

Thus, in *Peterson v. U.S.,* 344 F.2d 419 (CA–5, 1965), the court referred to two rules, one in 20 Am.Jur., "Evidence", § 704, where it was said that in criminal prosecutions it must appear that the ill or disabled witness, in reasonable probability, will never be able to attend the trial. The second rule, from 5 Wigmore on Evidence, § 1406(a), was that the duration of the illness need only be in probability such that, with regard to the importance of the testimony, the trial cannot be postponed. See 344 F.2d at 425, col. 1. However, in that case there was the further problem that at the prior trials there was no issue on conspiracy and thus no testing of her testimony in that regard by cross-examination. See 344 F.2d at 424. The unavailability of the witness in *Peterson* was due to a difficult pregnancy requiring a continuance of several months.

In *U.S. v. Bell,* 500 F.2d 1287 (CA–2, 1974), the absent witness was one of the identifying witnesses who had testified at a suppression hearing. The record contained a doctor's letter to the effect that the witness had recently undergone surgery and would not be able to testify for at least two

and a half months. This was regarded as ample support for the finding of unavailability, despite *Peterson,* which the court observed had been decided before *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) and *Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972). In 1974, when *Bell* was decided, the 1972 Draft Rules had been published, and the court refers to both Rule 804(a)(4) and Rule 804(b)(1), which were eventually adopted without change.

*Howard v. Sigler,* 454 F.2d 115 (CA–8, 1972) is a § 2254 habeas case. Petitioner had been convicted after a second trial, at which the transcript of the testimony of a witness at the first trial was received on the strength of a medical affidavit that the witness was in a hospital with positive contagious tuberculosis, that her condition would be greatly impaired by traveling at that time or in the near future, and that her disease was infectious. The district court had granted the writ on the ground that while the testimony itself could be received if the condition were met, without conflict with the Confrontation Clause, there had been a denial of confrontation rights by acting on the basis of the medical affidavit without producing the doctor. The Court of Appeals reversed, but without discussion of the question involved here.

There are State court decisions which are of little value because the question here is one of federal law. Since there are so few reported cases on the subject, they will be noted briefly.

*Harris v. Reeves,* 421 S.W.2d 689 (Tex. Civ.App., 1967) involved the admission of the testimony of an absent witness given in another trial of the same [civil] case. The opinion notes that the witness was unable to attend trial due to bronchial pneumonia for which she was under medication. The witness was cross-examined at the former

---

**8.** For an example of this last condition, see *U.S. v. Henry,* 448 F.Supp. 819 (D–N.J., 1978), where "unavailability" was due to valid 5th amendment claims by the witness. The earlier testimony was that given before a grand jury. The government could not offer it under Rule 801(d)(1)(A) since the declarant was not a witness at the trial and available for cross. Defendant could use it against the government if it were exculpatory, subject to possible application of Rules 106 and/or 806.

trial and the issues were substantially the same.

*Norburn v. Mackie,* 264 N.C. 479, 141 S.E.2d 877 (1965) was a [civil] case tried a second time after the non-suit granted in the first trial was set aside because there were jury questions. One of the witnesses who had testified did not appear at the second trial although subpoenaed. His earlier testimony was offered and received on the strength of a showing that he was inferentially over 65, had a total gastrectomy for a malignancy of the stomach some 9 months before, that he had to have about six meals a day and lie down awhile after each, and that travel to court (about 100 miles) would be detrimental to his health.

There are cases involving unavailability on grounds other than physical or mental illness or disability, such as absence from the jurisdiction, disappearance, and the like. A few are mentioned only for the possible value of the discussion of the subject as a whole.

*Gov't of Virgin Islands v. Aquino,* 378 F.2d 540 (CA–3, 1967) ordered a new trial in a Commonwealth case because recorded testimony of a witness who had testified at the preliminary hearing was received on the assumption that she had returned to Norway and without evidence of any effort to locate her and offer travel and subsistence expense.

*Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which involved the use of preliminary examination testimony of a witness whose whereabouts at trial were unknown. As a State law evidence case, it reached the Supreme Court only on Sixth amendment grounds, not on interpretation of the Federal Evidence Rules. However, the analysis of the interplay between hearsay exceptions and the Confrontation clause, in Part II of the majority opinion (448 U.S. at 62–67, 100 S.Ct. at 2537–40) is informative, although under the law of the case this court need not take up that aspect.

Nor is this court called upon to consider whether it should have undertaken the extensive effort to get medical data that has been gathered now.

As the Court of Appeals observed, "There is no question Mancuso was too sick to testify at the time of trial". Rather, the question addressed was whether there was a proper exercise of discretion in not adjourning the trial for a reasonable period to afford the witness enough time to recover from an illness "which might be temporary" and thus be available for live testimony. See 679 F.2d at 296. See also note 4, 679 F.2d at 297, observing that the mandate is not that an adjournment be allowed merely to wait indefinitely and see whether a witness recovers.

There had already been one adjournment, a brief one, due to the report at the hearing on February 18, 1981, when the court indicated it planned to carry the case to March 2, 1981 because the on-going trial of another case was in progress. The report was that the witness Lott was to have hernia surgery on the 3rd. Hernia repair does not indicate illness to the extent that severe coronary disease does and healing is more rapid. The adjournment was carried an extra 8 days to March 10th, and the case was put on "Ready, Hold."

The question now is whether Mancuso is presently available for trial. Since his present condition is chronic rather than acute (as it was during the second trial) time is not a factor unless his condition can be expected to improve. In this case, not as in *Peterson,* supra, the reasonable probability is that he will never be able to attend trial without substantial risk that his health may be seriously affected adversely. He is not going to get any better. The heart muscle damaged by the past infarctions will never be replaced, nor will the left ventricular function improve. He has severe coronary artery disease which will not get better. The only change that can occur is an acute incident of one kind or another.

Thus, the question can be answered without attempting to say that if he is reexamined in September, 1983 or in early 1984, he might somehow be able to testify. Every fact in evidence shows that with the pas-

sage of time Mancuso will get older and his cardiac condition will worsen.

### The Findings of Fact

At the time of trial, the estimate of 4 to 5 weeks after surgery was meaningless. On February 18, 1981, the Calzone trial was still on the government's case, and two new arraignments were taken, Crim. 81–58 and Crim. 81–59, with trial set for April 21, 1981. On March 10, when the Faison retrial was put on "Ready, Hold" a bench warrant was issued in another new case, Crim. 81–77, in which the Federal Public Defender appeared for defendant. On March 11th, the verdict in the Calzone case ·was returned, and the jury for Faison's second trial was drawn on March 13th, (the intervening time being needed to assemble the panel by phone), and testimony began on the 17th. On the same day, the 17th, the missing defendant in Crim. 81–77 appeared, entered a plea of not guilty, and trial was set for May 12, 1981. On March 19th, with the Faison trial in progress, arraignment was had in another new case, Crim. 81–94, for which trial was set for May 19, 1981.

At about the same time that the Calzone trial was set to begin, there was a conflict with another trial in a two-defendant bank robbery case. Because of the constraints of the Speedy Trial Act, the bank robbery case was reassigned to another judge for trial. It had been expected to be disposed of by a plea agreement under F.R.Crim.P. 11, but was not. On the day trial was to begin, one defendant discharged his lawyer, a Deputy Public Defender, and went to trial pro se. He was convicted, but the conviction was set aside out of concern that he had not fully understood the consequences of waiving his right to counsel. See *U.S. v. Welty,* 674 F.2d 185 (CA–3, 1982). He was tried a second time, with assigned counsel under the Criminal Justice Act, and convicted again. The second conviction now awaits disposition on appeal.

In a case like *Welty,* there could be some knotty questions under the Assistance of Counsel clause of Amendment 6 if some witness at the first trial became unquestionably unavailable, as by death, for the second trial and the prosecution offered the witness' testimony from the first trial at the second one. There is no such problem in this case because Faison was represented by able counsel at the first trial, and so well that the jury could not agree in the face of fundamentally overwhelming evidence. Thus the potential question is left for another case in which it actually arises.

Thus, the court was aware from the influx of new criminal cases, that there would be no "opening" on the calendar 4 to 5 weeks later. Before and during the second trial, dates had been set in at least 4 new criminal cases for trials to begin over the period from April 21 to May 19, 1981.

An adjournment at that time implied not 4 to 5 weeks (or to about the latter part of April) but to about mid-June. Faison's "willingness" to have the case put off despite the time schedules of the Speedy Trial Act had no meaning unless defendants in *other* cases down the line did not insist on their independent Speedy Trial Act rights. If they did insist, the continuance could be indefinite.[9]

9. The whipsaw effect of one defendant wanting a trial adjournment and the other insisting on Speedy Trial rights has been observed by every trial judge in this District at some time. Perhaps the most complex one was in *U.S. v. Galesi,* Crim 74–515, where the jury could not agree after extended deliberation in a trial that had lasted some 4 months. When the jury were discharged, the court set a new trial date a few weeks later in May and ordered the attorneys not to start any lengthy case. The leading defense counsel of the team (there were 4) began a murder trial in Morris County and his associate left for a vacation in California despite these orders. The trial court ordered his client severed from the others so that the retrial of the other two defendants could proceed, and directed the severed defendant to engage new counsel. One of the major factors in this ruling was that the Defender, representing another defendant, opposed an adjournment and insisted on Speedy Trial rights. The matter was taken to the Court of Appeals on application for writ of mandamus, and evidently the defendant who opposed adjournment and insisted on Speedy Trial did not make any presentation to the Court of Appeals which then acted to order an adjournment in the mistaken belief that all parties wanted an adjournment. The case was never retried. The government

There was no motion for new trial; the docket discloses none, and the opinion on appeal is mistaken in that regard. Such a motion would have had to be made within 7 days after verdict, F.R.Crim.P. 33, or by April 2, 1981, only about 2 weeks after Mancuso's surgery, while he probably was still in the hospital or recently sent home under strict orders, and long before the 4 to 5 week period had ended.

As noted at the outset, Mancuso was back in the hospital in May, 1981 and the court was not able to schedule his final sentence imposition until October 8, 1981, some 7 months after the report of March 4th, due to his ill health, and for the same reason felt it could not incarcerate him despite the fact that his offense called for at least a split sentence under 18 U.S.C. § 3651. The court recalls no instance where it has imposed less than a split sentence in the case of a mature adult who has committed the very serious crime of conspiracy and has forged eight signatures and passed 5 checks for more than $44,000 to carry out the conspiracy, except for very serious health conditions that could convert incarceration into an execution.

The underlying medical facts and history are clear, and the court has had at least 5 opportunities to observe Mancuso in the courtroom under varying conditions. The forecasts or opinions of the future expressed by the four doctors are varied. They range from the view of defendant's expert that Mancuso can testify, though under given conditions anything can happen while Mancuso is on the stand, through that of the independent expert who believes Mancuso can testify but puts time constraints and treatment conditions on his opinion along with the caution that the testimony should terminate if any adverse change should appear subjectively or objectively during testimony, to the opinions of Mancuso's regular treating physician and his cardiologist consultant, who are both of the strong view that he should not be compelled to testify because of the high risk of serious damage to his already poor health.

So far as the opinions are concerned, the court is clearly inclined to afford greater weight to the evaluation of the treating physician and his consultant. It is also impressed by the occurrence of two incidents of distress during the quiet and low-key hearing, with no jury present, while Mancuso was merely an observer.

He is unwilling to testify voluntarily in view of the recommendations of his own physicians. He says that if ordered by the court to appear and testify despite his doctors' orders, he will do so. However, the question is not whether the court should conduct an *in vivo* experiment by compelling Mancuso to appear and testify in order to see whether he in fact survives the stress without injury or not. The question, rather, is whether his condition of health is such that, in light of the known emotional stress he will experience there is a reasonable probability that his health will be seriously compromised, or worse, if he is put to such a test.

The determination of "unavailability" is one to be made without putting the witness to a test that the court is entirely satisfied would carry too great a risk to warrant his compulsory appearance at a new trial. Were the rule otherwise, no witness could be found to be unavailable on grounds of physical or mental disability without first putting the witness on the stand. Nothing in the reported cases or in the views expressed by writers on the subject remotely suggests that the question be resolved by actual test that no laboratory can duplicate. To do so would oblige the ailing witness to play Russian Roulette.

In situations where general health is at least average, and some temporary condition exists which can reasonably be expected to be overcome after moderate time, as was the case with the witness Lott who was expected to be able to come and testify soon after the hernia repair of March 3, 1981, and did, the problem is easily resolved by a brief adjournment tailored to the expected schedule and making further adjustments by controlling the order of proof.

accepted a plea from one defendant and dismissed charges against the other two, a lesser result than one offered at the end of the first week of the 4 month trial and rejected.

In Mancuso's situation, with a bad cardiac history going back to about age 37, with evidence of adverse congenital history in the family, and the involvement of a major vital organ, it is not a question of time. This major ailment is further complicated with his borderline diabetes, his inability to lose weight to the desired extent, and his hypertension.[10]

Nothing in the history remotely suggests that his poor health is not genuine. Regardless of which modern sophisticated test more precisely measures the extent of the damage from past infarctions and the coronary artery disease, there is no doubt that the damage is serious, does not heal, and poses a risk which is real even though it cannot be evaluated with certainty. The effect of emotional stress is a factor for which forecasts cannot be made with certainty.

In giving greater weight to the evaluation and opinion of Mancuso's treating physician and consulting cardiologist, the court has been careful to search for indications of bias and it is satisfied that there is none. The opinions so relied on are found to be sincere and motivated exclusively by the professional concern of physicians for the patient under their direct care.

It need hardly be said that nothing in the record remotely suggests that the United States is in any way responsible for Mancuso's condition, except in the indirect fashion that his indictment, plea, sentence and the stress of pretrial interviews and trial testimony may have contributed to the worsening of his condition. That is not the kind of "procurement" of unavailability that might otherwise have meaning.

These findings that lead to the ultimate ruling that Mancuso has been and is, and will continue to be unavailable have been made only after several thorough reviews of all the available material in the records of the court, including those portions that had not been transcribed before, and the daily minutes setting out details beyond that which appears on the docket sheet, not only in this case but in others that were at various stages. As noted above, the court's finding of unavailability is beyond a reasonable doubt without deciding whether that degree of persuasion is required by law.

*Consequential aspects*

The Court of Appeals vacated the judgment appealed from. It left the jury verdict as it was. The further proceedings conducted were for the purpose of ascertaining whether Mancuso was currently available to testify.

Since the conclusion is that he remains unavailable, there will not be a new trial, and the judgment of conviction is to be put back in force.[11]

The court has found no precedent to guide it in regard to the procedure to be followed in these circumstances. The prudent route would appear to be to enter an

---

**10.** A brief chronology of the cardiac history alone, as culled from the records, shows:

| 1960 | Myocardial infarction | Good Samaritan Hosp. |
| 1961 | Myocardial infarction | Good Samaritan Hosp. |
| 1963 | Myocardial infarction | Good Samaritan Hosp. |
| 1972 | Myocardial infarction | Valley Hosp. |
| 1972 | Myocardial infarction | Cleveland Clinic |
| 1979 | Myocardial infarction | Valley Hosp. |
| 1981 | Unstable angina | Valley Hosp. |
| 1981 | By-pass (two vessel) | St. Luke's Hosp. |
| 1981 | Chest Pain | Valley Hosp. |

**11.** This is not a case like *U.S. v. Jannotti,* 501 F.Supp. 1182 (D-Pa., 1980), rev'd., 673 F.2d 578 (CA-3, 1982) (en banc). In that case, there had been a verdict of guilty by the jury, and a renewal of requests for judgment of acquittal and dismissal, disposition of which had been reserved. The trial court then set aside the verdict and granted the motions for acquittal. That was the stage at which the case was when the appeal was heard and decided. The Court of Appeals reversed, and directed that the jury's verdict be reinstated. Thus, there had been no judgment of conviction and no sentence. The same would have been true had the question come up on a motion for new trial on grounds other than "newly discovered evidence", since that motion would be due within 7 days after verdict and sentence is unlikely to have been imposed, see F.R.Crim.P. 33.

Nor is this a case like *U.S. v. Twigg,* 588 F.2d 373 (CA–3, 1978), where the Court of Appeals reversed the convictions and directed dismissal of the indictment (except on one charge for possession of cocaine) on the ground that government involvement reached "a demonstrable level of outrageousness" and that so far as the record revealed Neville "was lawfully and peacefully minding his own affairs" (588 F.2d at 380–381). In that case there was no

order declaring Mancuso unavailable, that there is not to be a new trial, and scheduling a new sentence date at which sentence will be imposed. It is assumed that any new judgment of conviction cannot be of any greater severity than the one vacated by the Court of Appeals.

Nonetheless, nearly two years have gone by since Faison was sentenced May 5, 1981 to a 5 year general sentence on all four counts. In the unique circumstances the court believes there should be an updated presentence report as well as a fresh opportunity to Faison and his attorney to address the matter of sentence based on current facts and circumstances. The date for resentence is accordingly set down for May 10, 1983. Any materials that Faison wishes to offer should be submitted to the Probation Office.

remand for further proceedings, such as for an evidentiary hearing, even though bench conferences on the record showed that the United States possessed evidence of Neville's current activities with drugs in New York State, where search warrants had been executed. A New York detective had been put on the stand and sworn, and a bench colloquy followed outside the hearing of the jury, with an offer of proof based on what was found on the searches. There had been no trial and conviction on any of the New York charges and the court cautioned that the evidence might be risky even if offered to show predeliction under Fed.Ev.Rule 404(b). Presumably, an evidentiary hearing at the trial level would have shown much more clearly whether the conduct of the government agents was or was not egregious.